1

2

3

4

5

6

7    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
8    AT SEATTLE

9

| | |
|---|---|
| Diversified Lenders, LLC, an Oklahoma limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>Amazon Logistics, Inc., a Delaware corporation; Vertical Holdings Unlimited, LLC, a Florida limited liability company doing business as VHU Express,<br><br>                    Defendants. | Case No. 16-cv-1232-RSL<br><br>DECLARATION OF VANESSA POWER IN SUPPORT OF AMAZON'S MOTION FOR DEFAULT JUDGMENT AGAINST VERTICAL HOLDINGS UNLIMITED |
| Amazon Logistics, Inc.,<br><br>                    Cross-Claim Plaintiff,<br><br>          v.<br><br>Vertical Holdings Unlimited, LLC,<br><br>                    Cross-Claim Defendant. | |

22      I, Vanessa Power, declare as follows:

23          1.      I am one of the attorneys representing Amazon Logistics, Inc. ("Amazon") in this

24  matter.  I am over the age of 18 and competent to testify.  I make this declaration based on

25  personal knowledge.

26

DECLARATION OF VANESSA POWER IN SUPPORT OF AMAZON'S MOTION FOR DEFAULT JUDGMENT
AGAINST VERTICAL HOLDINGS UNLIMITED - 1
Case No. 16-cv-1232-RSL

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1      2.      During the course of this litigation, Vertical Holdings Unlimited ("VHU")

2   received subpoenas from both Amazon and Diversified Lenders, LLC ("Diversified") to produce

3   documents.  Amazon and Diversified deposed VHU's principal, Lisa Bythewood, both as a

4   designated corporate representative for VHU under FRCP 30(b)(6) and in her individual

5   capacity.

6      3.      On June 1, 2016, Amazon issued a demand for defense and indemnification to

7   VHU with respect to Diversified's claims against Amazon.  Attached at **Exhibit A** is a true and

8   correct copy of that demand.

9      4.      VHU refused to defend and indemnify Amazon.  Attached at **Exhibit B** is a true

10  and correct copy of VHU's response to Amazon's demand for defense and indemnification,

11  indicating VHU's refusal to defend and indemnify.

12

13         I declare under penalty of perjury under the laws of the State of Washington and the

14  United States that the foregoing is true and correct to the best of my ability.

15

16         SIGNED at Seattle, Washington this 9th day of May, 2018.

17                                    s/ Vanessa Power
                                      _____
18                                    Vanessa Soriano Power, WSBA No. 30777

19

20

21

22

23

24

25

26

DECLARATION OF VANESSA POWER IN SUPPORT OF AMAZON'S MOTION FOR DEFAULT JUDGMENT
AGAINST VERTICAL HOLDINGS UNLIMITED - 2
Case No. 16-cv-1232-RSL

96891153.1 0053837-00652

**CERTIFICATE OF SERVICE**

1

2       I hereby certify that on May 9, 2018, I electronically filed the foregoing

3  DECLARATION OF VANESSA POWER IN SUPPORT OF AMAZON'S MOTION FOR

4

5  DEFAULT JUDGMENT AGAINST VERTICAL HOLDINGS UNLIMITED with the Clerk of

6  the Court using the CM/ECF system which will send notification of such filing to the following:

7
- **Franklin Dennis Cordell**
  fcordell@gordontilden.com,jlucien@gordontilden.com
8
- **Jocelyne Anne Macelloni**
  jocelyne.macelloni@uulaw.net,tami.gordon@uulaw.net,joshua.brownlee@uulaw.net
9
- **Jeffrey M Thomas**
  jthomas@gordontilden.com,chudson@gordontilden.com
10
- **Jared Alan Ullman**
  jared.ullman@uulaw.net,secretary_assistant@uulaw.net,tami.gordon@uulaw.net,joshua.
11    brownlee@uulaw.net
12
- **Michael W. Ullman**
  michael.ullman@uulaw.net,tami.gordon@uulaw.net,joshua.brownlee@uulaw.net,diana.si
13    mon@uulaw.net

14

15                 s/ Vanessa Power
                  Vanessa Soriano Power, WSBA No. 30777
16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE - 1
Case No. 16-cv-1232-RSL

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

| | |
|---|---|
| **From:** | Power, Vanessa Soriano <vanessa.power@stoel.com> |
| **Sent:** | Monday, June 06, 2016 1:29 PM |
| **To:** | lbythewood@gmail.com |
| **Subject:** | Diversified v. Amazon - Amazon Demand for Defense and Indemnification |
| **Attachments:** | 06-06-2016 VHU Indemnification Demand - Email.PDF; Complaint.pdf |

**Re:** *Diversified Lenders, LLC v. Amazon Logistics, Inc. and Vertical Holdings Unlimited, LLC*
      **M.D. Fla Case No. 16-cv-1058-VMC-MAP**
      **DEMAND FOR DEFENSE AND INDEMNIFICATION**

Dear Ms. Bythewood,

Please see the attached letter on behalf of Amazon Logistics, Inc. This was sent by mail to the noted addresses last week. I'm now directing the same to you by email.

I look forward to hearing from you. If VHU is represented by counsel, please let me know their contact information and I will follow up with your counsel directly.

Best regards,
Vanessa

**Vanessa Soriano Power** | Partner
**STOEL RIVES LLP** | 600 University Street, Suite 3600 | Seattle, WA 98101-4109
Direct: (206) 386-7553 | Mobile: (206) 696-1324 | Fax: (206) 386-7500
vanessa.power@stoel.com | Bio | vCard | www.stoel.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any unauthorized review, use, or distribution is prohibited and may be unlawful.

EXHIBIT A, PAGE 04 OF 48

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

DIVERSIFIED LENDERS, LLC, an Oklahoma limited liability company

Plaintiff(s)

v.   Civil Action No. 8:16-cv-1058-T-33MAP

AMAZON LOGISTICS, INC., a Delaware corporation and VERTICAL HOLDINGS UNLIMITED, LLC d/b/a VHU EXPRESS, a Florida limited liability company

Defendant(s)

## SUMMONS IN A CIVIL ACTION

To: (Defendant's name and address) AMAZON LOGISTICS, INC.

By serving its Registered Agent: CORPORATION SERVICE COMPANY
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  MICHAEL W. ULLMAN, ESQ.
ULLMAN & ULLMAN, P.A.
7700 West Camino Real, Suite 401
Boca Raton, Florida 33433

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: 4-29-16

Signature of Clerk or Deputy Clerk

Date Served: 5/2/16

Time Served: 300

DN

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:16-cv-1058-T-33 UAP

DIVERSIFIED LENDERS, LLC,
an Oklahoma limited liability company

    Plaintiff,

v.

AMAZON LOGISTICS, INC., a Delaware
corporation; and VERTICAL HOLDINGS
UNLIMITED, LLC d/b/a VHU EXPRESS, a
Florida limited liability company,

    Defendants.

_____/

## COMPLAINT

Plaintiff Diversified Lenders, LLC, an Oklahoma limited liability company ("Diversified"), by and through undersigned counsel, hereby sues Defendants, Amazon Logistics, Inc., a Delaware corporation ("Amazon") and Vertical Holdings Unlimited, LLC d/b/a VHU Express, a Florida limited liability company ("Vertical"), and in support thereof, states the following:

### JURISDICTIONAL ALLEGATION

1.      This Court has original subject matter jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a) because Diversified, an Oklahoma limited liability company, having its principal place of business and its sole managing member's state of incorporation and principal place of business in Texas and Oklahoma, respectively, and Amazon, a corporation that is incorporated in Delaware and having its principal place of business in Washington or a state other than Texas or Oklahoma, and Vertical is a limited liability company, having both its

TPAD 34449
$400.00

ULLMAN & ULLMAN, P.A.
7700 West Camino Real · Suite 401 · Boca Raton · Florida · 33433
(561) 338-3535   (561) 338-3581

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 2 of 8

principal place of business, and its managing members in Florida or a state other than Texas or Oklahoma.

2.    The amount in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332(a).

3.    In addition, pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over all claims that are "so related to the claims in the action within [its] original jurisdiction that they form part of the same case or controversy."

## VENUE ALLEGATION

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) in that this action is filed in "a judicial district in which a defendant resides." More specifically, Amazon entered into a contract (the "Delivery Provider Contract") with Vertical, a Florida limited liability company which resides in Hillsborough County, Florida, in that Vertical is an entity that is subject to personal jurisdiction the judicial district at the time this action is commenced.

## PARTY ALLEGATIONS

5.    The Plaintiff, Diversified, is an Oklahoma limited liability company with its principal place of business in Edmond, Oklahoma. The sole member of Diversified is Diversified Lenders, Inc., a Texas for-profit corporation.

6.    Defendant Amazon is a Delaware corporation with its principal place of business located in Seattle, Washington. Amazon engages in systematic and not isolated business within Florida.

7.    Defendant Vertical is a Florida limited liability company with its principal place of business in Tampa, Florida. Vertical has two managing members, Lisa Blythewood and Craig Blythewood, both of whom reside in Valrico, Florida.

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 3 of 8

## ALLEGATION REGARDING CONDITIONS PRECEDENT

8.      Diversified has performed all conditions precedent with respect to the actions herein sued upon, or same have occurred, been waived or been excused.

## COUNT I - AMAZON'S BREACH OF THE STATUTORY DUTY TO PAY DIVERSIFIED

Plaintiff, Diversified, sues Defendant Amazon for breach of its statutory duty to pay Diversified in violation of 9-406 of the Uniform Commercial Code.

9.      Diversified hereby readopts and realleges paragraphs 1 through 8 as if each were fully and independently realleged herein.

10.      Through the Loan Documents (as defined in paragraph 20 below), Vertical granted Diversified a security interest in and to Vertical's assets, which included, among other things, all of Vertical's then owned or later acquired Accounts, equipment, inventory, goods, etc., and all proceeds thereof (collectively, the "Collateral").

11.      On or about April 28, 2015, Diversified and Vertical sent a letter to and which letter was received by Amazon, giving notice that Vertical's present and future Accounts had been assigned to Diversified, and providing that all present and future payments owing to Vertical must be paid by Amazon to, and only to, Diversified (the "First Notice of Assignment"). A true and correct copy of the First Notice of Assignment is attached as **Exhibit "1."**

12.      On or about September 30, 2015, Diversified and Vertical sent a second letter to and which letter was received by Amazon, again giving notice that Vertical's present and future Accounts had been assigned to Diversified, and providing that all present and future payments owing to Vertical must be paid by Amazon to and only to Diversified (the "Second Notice of Assignment").      A true and correct copy of the Second Notice of Assignment is attached as **Exhibit "2."**

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 4 of 8

13.    Pursuant to the Loan Documents, Vertical granted to Diversified a security interest and in connection therewith, assigned to Diversified the right to receive payment for among others, the following invoices for transportation services provided by Vertical to Amazon:

| INVOICE NUMBER | DATE | AMOUNT |
|---|---|---|
| 1047 | 8/18/2015 | $ 27,586.44 |
| 1049 | 8/24/2015 | $ 34,176.80 |
| 1054 | 8/27/2015 | $ 27,339.56 |
| 1065 | 9/6/2015 | $ 44,991.90 |
| 1066 | 9/6/2015 | $ 38,022.78 |
| 1067 | 9/6/2015 | $ 19,094.22 |
| 1068 | 9/6/2015 | $ 41,992.16 |
| 1083 | 9/21/2015 | $ 32,836.36 |
| 1081 | 9/22/2015 | $ 40,671.10 |
| 1086 | 9/25/2015 | $ 15,966.24 |
| 1087 | 9/25/2015 | $ 41,066.15 |
| 1088 | 9/25/2015 | $ 21,363.86 |
| 1089 | 9/25/2015 | $ 40,904.93 |
| 1090 | 9/28/2015 | $ 44,854.55 |
| 1095 | 10/5/2015 | $ 9,846.28 |
| 1096 | 10/7/2015 | $ 46,629.63 |
| 1097 | 10/7/2015 | $ 43,136.36 |
| 1098 | 10/7/2015 | $ 38,943.10 |
| 1099 | 10/7/2015 | $ 39,400.43 |
| 1100 | 10/7/2015 | $ 42,514.68 |
| 1106 | 10/19/2015 | $ 42,475.24 |
| 1107 | 10/19/2015 | $ 43,136.36 |
| 1108 | 10/19/2015 | $ 37,733.34 |
| 1109 | 10/19/2015 | $ 38,647.07 |
| 1116 | 10/23/2015 | $ 37,733.34 |
| 1117 | 10/23/2015 | $ 38,647.07 |
| 1122 | 10/31/2015 | $ 5,008.57 |
| 1118 | 11/1/2015 | $ 46,779.20 |

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 5 of 8

| 1119 | 11/1/2015 | $ | 47,020.13 |
|------|-----------|---|-----------|
| 1120 | 11/1/2015 | $ | 41,348.87 |
| 1121 | 11/1/2015 | $ | 50,287.37 |
| 1134 | 11/19/2015 | $ | 33,930.76 |
| 1135 | 11/19/2015 | $ | 20,462.66 |
| 1136 | 11/19/2015 | $ | 24,920.45 |
| 1137 | 11/19/2015 | $ | 28,697.87 |
| 1138 | 11/19/2015 | $ | 730.00 |
| 1143 | 11/22/2015 | $ | 29,832.58 |
| 1159 | 11/29/2015 | $ | 15,016.69 |
| 1162 | 11/29/2015 | $ | 19,403.39 |
| 1157 | 12/6/2015 | $ | 23,529.97 |
| 1160 | 12/6/2015 | $ | 19,232.14 |
| 1163 | 12/6/2015 | $ | 19,998.38 |
| 1165 | 12/6/2015 | $ | 19,960.66 |
| 1158 | 12/13/2015 | $ | 25,174.84 |
| 1161 | 12/13/2015 | $ | 19,232.14 |
| 1164 | 12/13/2015 | $ | 19,444.41 |
| 1166 | 12/27/2015 | $ | 13,648.63 |
| 1167 | 12/27/2015 | $ | 31,202.12 |
| 1189 | 1/17/2016 | $ | 12,068.52 |
| 1190 | 1/17/2016 | $ | 25,192.69 |
| 1192 | 1/17/2016 | $ | 34,222.82 |
| 1193 | 1/24/2016 | $ | 12,068.52 |
| 1194 | 1/24/2016 | $ | 25,923.21 |
| 1196 | 1/24/2016 | $ | 32,370.40 |
| 1199 | 1/24/2016 | $ | 12,068.52 |
| 1198 | 1/31/2016 | $ | 33,469.53 |
| 1200 | 1/31/2016 | $ | 21,464.19 |
| 1197 | 2/1/2016 | $ | 7,808.24 |
| 1207 | 2/7/2016 | $ | 8,779.05 |
| 1202 | 2/7/2016 | $ | 12,405.20 |
| 1203 | 2/7/2016 | $ | 9,403.49 |
| 1204 | 2/7/2016 | $ | 29,779.98 |
| 1205 | 2/7/2016 | $ | 4,704.75 |
| 1206 | 2/7/2016 | $ | 5,744.10 |
| 1207 | 2/7/2016 | $ | 2,081.50 |

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 6 of 8

| 1208 | 2/7/2016 | $ 5,695.25 |
| 1189A | 1/20/2016 | $ 1,232.00 |
| **TOTAL** | | **$1,781,053.74** |

The above-stated sixty-seven (67) invoices shall hereinafter be collectively referred to as the "Outstanding and Unpaid Invoices."

14.     Amazon received each of the Outstanding and Unpaid Invoices and has neither communicated nor objected to any of the services provided by Vertical to Amazon supporting the sums due under the Outstanding and Unpaid Invoices.

15.     As a result of Amazon having received the First Notice of Assignment and the Second Notice of Assignment, Amazon's obligation under Section 9-406 of the Uniform Commercial Code ("UCC")[1] became triggered, which subsection states that:

> . . . an account debtor [Amazon] on an account ... may discharge its obligation by paying the assignor [Vertical] until, but not after, the account debtor [Amazon] receives a notification, authenticated by the assignor [Vertical] or the assignee [Diversified], that the amount due or to become due has been assigned and that payment is to be made to the assignee [Diversified]. After receipt of the notification, the account debtor [Amazon] **may discharge its obligation by paying the assignee [Diversified] and may not discharge the obligation by paying the assignor [Vertical].**

UCC § 9-406(a) (emphasis added).

16.     Diversified has never received any payment of any of the amounts due and owing in connection with the Outstanding and Unpaid Invoices notwithstanding that the Outstanding and Unpaid Invoices have each individually matured and have been collectively delinquent from the most recent invoice having been outstanding in excess of thirty (30) days (invoice 1216) to the oldest invoice being outstanding in excess of one hundred and eighty (180) days (invoice 1066).

---

[1] This statute of the UCC has been adopted by the State of Florida as Fla. Stat. § 679.4061.

ULLMAN & ULLMAN, P.A.
7700 West Camino Real · Suite 401 · Boca Raton · Florida · 33433
(561) 338-3535 · (561) 338-3581

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 7 of 8

17.    Diversified has suffered damages by virtue of Amazon having failed to fulfill its obligation to make payment to Diversified under the terms of the invoices and as statutorily required by UCC § 9-406.

18.    Amazon owes Diversified the sum of $1,691,950.94, plus prejudgment interest at the rate prescribed by law, as well as its reasonable attorney's fees and costs pursuant to UCC §9-615(a)(1).

WHEREFORE, Plaintiff Diversified Logistics, LLC prays for a judgment against Defendant Amazon Logistics, Inc. in the amount of at least $1,691,950.94, together with prejudgment interest, costs and as may be allowed, reasonable attorney's fees and such other relief, as this Court deems appropriate.

## COUNT II – VERTICAL'S BREACH OF CONTRACT

Plaintiff, Diversified, sues Defendant, Vertical, for Vertical's breach of its contractual duty to pay Diversified.

19.    Diversified hereby readopts and realleges paragraphs 1 through 8 as if each were fully and independently realleged herein.

20.    On or about September 30, 2015, Diversified entered into an Accounts Receivable Finance Agreement arrangement (the "Agreement") and a related Revolving Credit Note (the "Note") with Vertical (the Agreement and Note are collectively the "Loan Documents"). The Loan Documents provided, *inter alia*, a revolving credit line whereby Diversified agreed to lend funds to Vertical. True and accurate copies of the Agreement and Note are attached as composite **Exhibit "3."**

21.    In accordance with the Loan Documents, Vertical was required to make certain payments to Diversified upon receipt of payment of its accounts receivable, as discussed in the Agreement.

EXHIBIT A, PAGE  12 OF 48

*Diversified Lenders, LLC v. Amazon Logistics, Inc. and*
*Vertical Holdings Unlimited, LLC d/b/a VHU Express*
Complaint
Page 8 of 8

22.     Diversified has never received any payment of any of the amounts due and owing in connection with the Loan Documents, despite demand therefore.

23.     Vertical materially breached the Loan Documents with Diversified by either the occurrence of or by breaching sections 9.1(a), (j), (k) and (m) of the Loan Documents.

24.     Vertical owes Diversified compensatory damages, together with prejudgment interest at the rate prescribed by law, as well as Diversified's reasonable attorneys' fees and costs incurred, pursuant to Section 10.2 of the Agreement.

WHEREFORE, Plaintiff Diversified Logistics, LLC prays for a judgment against Defendant Vertical Holdings Unlimited, LLC d/b/a VHU Express in excess of $1,500,000.00, together with prejudgment interest, costs and as may be allowed, reasonable attorney's fees and such other relief, as this Court deems appropriate.

Dated: April 28, 2016.

Respectfully submitted,

ULLMAN & ULLMAN, P.A.
*Attorneys for Diversified Lenders, LLC*
7700 West Camino Real, Suite 401
Boca Raton, Florida 33433
Telephone: (561) 338-3535
Facsimile: (561) 338-3581

BY:

MICHAEL W. ULLMAN
Florida Bar No. 259667
Email: michael.ullman@uulaw.net
JARED A. ULLMAN
Florida Bar No. 90500
Email: jared.ullman@uulaw.net
JOCELYNE A. MACELLONI
Florida Bar No. 92092
Email: jocelyne.macelloni@uulaw.net

## NOTIFICATION AGREEMENT

Attention: **CONTROLLER/MANAGER**

RE: Notice of Sale and Assignment of Accounts Receivable and change in Payment Instructions by: VERTICAL HOLDINGS UNLIMITED, LLC d/b/a VHU EXPRESS to Diversified Lenders, LLC

To Whom It May Concern:

We are pleased to advise that, to enable us to better service our customers, we have assigned our present and future accounts to Diversified Lenders, LLC

As part of their service, they are providing us with a centralized billing and accounts receivable processing. Therefore, we request your cooperation in remitting payments on all open invoices as well as those subsequently received to:

If paying by check, mail to:       If paying electronically:
VERTICAL HOLDINGS              Diversified Lenders, LLC
UNLIMITED, LLC AND             Arvest Bank
Diversified Lenders, LLC           Routing Number: 103112976
Post Office Box 268957            Account Number: 85830745
Oklahoma City, OK 73126-8957    Payment Advice: kgutierrez@diversifiedlenders.com

This financial arrangement has been duly recorded under appropriate State Statutes and Uniform Commercial Codes. Please make a notation in your ledger.

If there are any questions concerning your billing, please feel free to call Diversified Lenders, LLC, at:

405-715-5720

This notice and instruction remains in full force and effect until you are notified by both the undersigned and Diversified Lenders, LLC, in writing to the contrary. Thank you for your cooperation.

Date: April 28, 2015

Diversified Lenders, LLC                        VERTICAL HOLDINGS UNLIMITED,
                                                LLC d/b/a VHU EXPRESS

By:_____              By:_____
Name: David Pendley                       Name: Lisa Bythewood
Title: Vice President                     Title: CEO

**EXHIBIT**

EXHIBIT A, PAGE  14 OF 48

## NOTIFICATION AGREEMENT

**Attention:**     CONTROLLER/MANAGER

**RE:**     Notice of new Accounts Receivable Financing Agreement and change in Payment
Instructions by: VERTICAL HOLDINGS UNLIMITED, LLC d/b/a VHU EXPRESS

---

**To Whom It May Concern:**

We are pleased to advise that, to enable us to better service our customers and expand our geographic market, we have entered into a new financing agreement with Diversified Lenders, LLC.

As part of their service, they are providing us with a centralized accounts receivable processing and collection services. Therefore, we request your cooperation in remitting payments on all open invoices as well as those subsequently received to:

**If paying by check, mail to:**              **If paying electronically:**
VERTICAL HOLDINGS UNLIMITED, LLC          Diversified Lenders, LLC/VHU EXPRESS
d/b/a VHU EXPRESS c/o Diversified Lenders, LLC   Arvest Bank
P.O. Box 268957                    Routing Number: 103112976
Oklahoma City, OK 73126-8957             Account Number: 85830745
                          Payment Advice: kgutierrez@diversifiedlenders.com

If there are any questions concerning your billing, please feel free to call Diversified Lenders, LLC at:

                **(405) 715-5720      Fax – (405) 715-5735**

This notice and instruction remains in full force and effect until you are notified by both the undersigned and Diversified Lenders, LLC in writing to the contrary.  Thank you for your cooperation.

Date: September 30, 2015

Diversified Lenders, LLC                 VERTICAL HOLDINGS UNLIMITED, LLC
                             d/b/a VHU EXPRESS

By:                             By:
    David Pendley, Vice President            Lisa Bythewood, Chief Executive Officer

**EXHIBIT**

2

## ACCOUNTS RECEIVABLE FINANCE AGREEMENT

This ACCOUNTS RECEIVABLE FINANCE AGREEMENT is made as of the 30th day of September, 2015, by and between DIVERSIFIED LENDERS, LLC, an Oklahoma limited liability company ("Lender") and VERTICAL HOLDINGS UNLIMITED, LLC d/b/a VHU EXPRESS, a Florida limited liability company ("Borrower"). Each of Lender and Borrower is a "Party" and, collectively, they are "Parties".

### WITNESSETH:

WHEREAS, Borrower desires to borrow from Lender, and Lender is willing to make loans to Borrower upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of Ten and No/100 Dollars ($10.00), the terms and conditions contained herein, any extension of credit heretofore, now, or hereafter made by Lender to Borrower, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

### I. GENERAL DEFINITIONS

When used herein, the following terms shall have the following meanings:

"Account(s)": all of Borrower's present and future rights to payment for goods, merchandise, or inventory sold, rented or leased or for services rendered, including, without limitation, those which are not evidenced by instruments or chattel paper, and whether or not they have been earned by performance, including, but not limited to, account(s), accounts receivable, proceeds of any letters of credit of which Borrower is a beneficiary, contract rights, acceptances, notes, chattel paper; instruments (other than margin stock), drafts, documents, insurance proceeds, deposits or other sums credited by or due from the Lender to Borrower; and all such obligations whatsoever owing to Borrower, together with all instruments and all documents of title representing any of the foregoing, all rights in any goods, merchandise, or inventory which any of the same may represent, all rights in any returned or repossessed goods, merchandise and inventory, and all right, title, security, and guaranties with respect to each of the foregoing, including, without limitation, any right of stoppage in transit. To the extent not included in the foregoing, Accounts shall also include "accounts" as defined in the UCC.

"Account Debtor": any Person (as defined herein) who is or who may become obligated to Borrower under, with respect to, or on account of an Account.

"Affiliate": means with respect to any entity, any other entity or Person that controls, is controlled by, or is under common control with such entity in question. For purposes hereof, the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any such entity or the power to veto major policy decisions of any such entity, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement": this Accounts Receivable Finance Agreement, including all Exhibits and Schedules hereto, as the same may be from time to time amended, modified, or supplemented.

"Borrowing Base": the total of Borrower's Eligible Accounts.

"Charges": all national, federal, state, county, city, municipal, and/or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances upon and/or relating to: (A) the Collateral (as defined herein); (B) the Liabilities (as defined herein); (C) Borrower's employees, payroll, income, and/or gross receipts;



Initials

**EXHIBIT 3**

(D) Borrower's ownership and/or use of any of its assets; (E) any other aspect of Borrower's business; or (F) as set forth in Schedule A.

"Collateral": all property and interests in property of any nature now owned or hereafter existing, acquired, or arising securing payment of the Liabilities, including without limitation: (a) all of Borrower's Accounts, General Intangibles, inventory, goods, equipment, furniture, and fixtures; (b) all of Borrower's right, title and interest in and to any deposits or other sums at any time credited by or due from banks to Borrower and any other bank accounts of Borrower, with the same rights therein as if the deposits or other sums were credited by or due from banks to Lender; (c) all monies and property of any kind now or at any time or times hereafter in the possession or under the control of Lender or a bailee of Lender; (d) all accessions to, substitutions for and all replacements, products and proceeds of the foregoing, including, without limitation, proceeds of insurance policies insuring the Collateral; and (e) all books and records (including, without limitation, customer lists, credit files, computer programs, print-outs and other computer materials and records, whether tangible or intangible and regardless of the manner in which they are stored) of Borrower pertaining to any of the foregoing. All terms not otherwise defined herein shall have the meanings ascribed to them in the UCC.

"Commitment Period": the period from and including the Funding Date to, but not including, the Termination Date.

"Contract Rate": a fluctuating rate per annum equal to the Prime Rate plus two and one-half percent (2.50%).

"Default Rate": a fluctuating rate per annum equal to the Contract Rate plus three percent (3%).

"Eligible Accounts": Such Accounts that are, and at all times shall continue to be, acceptable to Lender, in its sole discretion. Borrower shall supply to Lender information regarding Accounts in form and substance satisfactory to Lender, including without limitation such information as may be necessary to establish to Lender's satisfaction that: (a) any goods giving rise to the Account have been shipped or delivered to, and any services giving rise to the Account have been performed in accordance with Borrower's agreement with, an Account Debtor on an absolute and unsecured sale basis and not on consignment, on approval, on bill-and-hold, on a sale-or-return basis or subject to any other repurchase or return agreement on an open account basis; (b) no material part of any goods giving rise to the Account has been returned, rejected, lost or damaged; (c) the Account is not an instrument of any kind and not evidenced by chattel paper or an instrument of any kind; (d) the Account Debtor is not insolvent or the subject of any bankruptcy or insolvency proceeding of any kind, nor is any such proceeding threatened; (e) action has not been filed, or threatened, by or against the Account Debtor for relief under the Bankruptcy Code nor has Account Debtor made an assignment for the benefit of creditors; (f) Borrower shall not have maintained possession and/or control of any goods sold (either directly or through an agent or custodian) giving rise to the Account nor are such goods subject to further and/or future direction from the applicable Account Debtor; (g) the Account does not arise out of transactions with an employee, officer, agent, director, control stockholder, or Affiliate of Borrower except as approved by Lender; (h) the Account does not arise out of a sale not in the ordinary course of business; (i) the Account is a valid, legally enforceable obligation of the Account Debtor thereunder and is not subject to any claim, dispute, or defense on the part of such Account Debtor; *provided, however,* that if an Account is subject to a defense, dispute, or claim, it may in the sole discretion of Lender be partially eligible after adjustment for such offset, defense, or claim; (j) the sale giving rise thereto is not to an Account Debtor located outside the United States or Canada; (k) the Account is subject to no lien or security interest whatsoever, except for the security interest of Lender hereunder; (l) the Account is evidenced by an invoice and proof of shipment of any goods or performance of any services giving rise to the Account, in form acceptable to Lender, which invoice requires payment not later than thirty (30) days from the date of the invoice and such Account has not remained unpaid more than ninety (90) days after the date of such invoice; (m) the Account is not owing from an Account Debtor from which fifty percent (50%) or more of the Accounts owing are more than ninety (90) days past the invoice date; (n) the Account Debtor is not the United States of America or the Commonwealth of Puerto Rico or



any department, agency or instrumentality thereof; and (o) the Account Debtor is not also Borrower's supplier or creditor.

An Account which was previously an Eligible Account may at Lender's sole discretion cease to be an Eligible Account.

"Funding Date": the date upon which the Lender initially advances funds under the Revolving Credit Note, this Agreement, and the Other Agreements.

"General Intangibles": all present and future general intangibles and other personal property (including, but not limited to, choses or things in action, goodwill, patents, trade names, trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, monies due under any royalty or licensing agreements, infringement claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims) other than goods and Accounts, and Borrower's books and records relating to any of the foregoing. To the extent not included in the foregoing, General Intangibles shall also include "general intangibles" as defined in the UCC

"Indebtedness": all loans, advances, debts, liabilities, obligations, covenants, duties and indebtedness of any and every kind and nature, including, without limitation, liabilities and all obligations to trade creditors, whether heretofore, now or hereafter owing, arising, due, or payable from Borrower to any Person and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise.

"Liabilities": any and all obligations, liabilities and Indebtedness of Borrower to Lender of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, direct or indirect and whether arising or existing under written or oral agreement or by operation of law.

"Lien": any mortgage, lien, pledge, security interest, title retention arrangement, levy, assessment, claim or other encumbrance upon or relating to the Collateral, the Liabilities, the employees, payroll, income, profits, gross receipts, assets, property (real, personal or mixed) or business of Borrower or any Affiliate of Borrower.

"Note": the Revolving Credit Note substantially in the form attached hereto as Exhibit A and all renewals, modifications, amendments, and replacements thereof.

"Other Agreements": all Supplemental Documentation (as defined below) and all agreements, instruments and documents, including, without limitation, notes, guaranties, mortgages, escrow agreement, deeds of trusts, chattel mortgages, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements, subordination agreements, participation agreements, trust account agreements, agreements relating to any letter of credit, and all other written matter whether heretofore, now, or hereafter executed by or on behalf of Borrower and/or delivered to Lender with respect to this Agreement.

"Person": any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, Party, or government (whether national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Prime Rate": the highest prime rate published daily in The Wall Street Journal under "Money Rates" or in such other published source as Lender may from time to time hereafter reasonably designate in writing,

ACCOUNTS RECEIVABLE FINANCE AGREEMENT - Page No. 3   Rev. 0315

whether such rate is actually ever charged or paid; *provided, however,* for purposes of establishing the Contract Rate such rate shall be deemed to be no less than 4.00% per annum.

"Revolving Credit Commitment": the agreement of Lender to make revolving credit loans to Borrower not to exceed One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00) pursuant to Section 2.1.

"Supplemental Documentation": all agreements, instruments, documents, financing statements, warehouse receipts, bill of lading, notices of assignment of accounts, schedules of accounts assigned, mortgages, landlord's consents, landlord's waivers and other written matter necessary or requested by Lender to perfect, maintain perfected, or enforce Lender's security interest in and rights in respect of the Collateral.

"Termination Date": as defined in Section 2.

"UCC": the Uniform Commercial Code of the State of Oklahoma as from time to time amended.

## 2. LOANS: GENERAL TERMS

2.1   Loan Amount. Provided that there does not then exist an Event of Default or any event or conditions which, with notice, lapse of time and/or the making of such loan, would constitute an Event of Default, and notwithstanding anything to the contrary contained herein or in the Other Agreements, Lender agrees to make advances to or for the benefit of Borrower in an aggregate amount up to the Revolving Credit Commitment during the term of this Agreement, which advances shall be subject to all of the terms and conditions of this Agreement and shall be a revolving line of credit consisting of loans against Borrower's Eligible Accounts as set forth on Schedule A.

2.2   Revolving Credit Note. The revolving credit loans under the Revolving Credit Commitment shall be evidenced by the Note executed by Borrower payable to the order of Lender, representing the obligation of Borrower to pay the aggregate unpaid principal amount of all revolving credit loans made by Lender to Borrower, together with interest, charges, fees, and other expenses thereon as prescribed by this Agreement. Lender is authorized to maintain a record of all disbursements and receipts of principal and interest under the Note, which record shall constitute prima facie evidence of the accuracy of the information contained therein.

2.3   Termination. (A) The initial Termination Date shall be one year from the Funding Date and the Commitment Period shall be automatically extended for successive one year periods thereafter ("Renewal Terms"), unless terminated as provided in this Agreement. Notwithstanding any provision herein or in any Other Agreement to the contrary, the outstanding principal amount of the Note shall be payable upon an Event of Default, as defined herein, or upon the Termination Date, whichever first occurs.

(B)   So long as no interest is then unpaid, Borrower may, at its option, prepay the Note in whole and terminate the Revolving Credit Commitment after the end of the first year of this Agreement by giving Lender irrevocable written notice of its intention to make such prepayment and termination at least ninety (90) days prior thereto, provided, that, in order for notice of such termination by Borrower to become effective, Borrower shall, on the date specified for such prepayment, pay to Lender, in cash or by federal wire transfer, the total amount of the Liabilities outstanding to the date of such prepayment, and Borrower shall also pay to Lender, a termination fee equal to five percent (5.0%) of the Revolving Credit Commitment to compensate Lender for the administrative expense of early termination, expenses incurred by Lender in connection with arranging for the availability of funds to fund the Revolving Credit Commitment for the entire Renewal Term, maintenance of the yield to be realized by Lender on advances made during the entire Renewal Term, and related items, all of which the Parties agree are difficult to determine and of which the termination fee constitutes a reasonable estimate and not a penalty (the "Commitment Termination Fee").

Initials

(C)     Borrower may terminate the Revolving Credit Commitment under this Agreement, without payment of the Commitment Termination Fee to the Lender, on the Termination Date or at the end of any Renewal Term by giving Lender ninety (90) days' prior written notice of such termination by certified or registered mail.

(D)     Lender may terminate the Revolving Credit Commitment under this Agreement and the Other Agreements at any time after the date of this Agreement by giving Borrower thirty (30) days prior written notice of such termination, by certified or registered mail.

(E)     Upon termination, however occurring, Borrower covenants and agrees that Borrower shall deliver to Lender such documents, agreements, releases, and indemnifications as Lender may require in order to release and indemnify Lender from any and all claims and causes of action arising from the Revolving Credit Commitment, including without limitation the loans incident thereto, the Accounts, and any other Collateral. Borrower covenants and agrees that Lender shall be under no obligation to release its lien and security interest in the Collateral until such time as Lender has received such documentation.

2.4     Mandatory Prepayments. If at any time during the Commitment Period the unpaid principal balance of the Note shall exceed the Borrowing Base, Borrower shall prepay an amount equal to such excess within two days after notice from Lender.

2.5     Interest Charges

(A)     Borrower shall pay Lender interest on the actual daily outstanding principal amount of the Liabilities at the Contract Rate.

(B)     Notwithstanding the foregoing, (i) if at any time the amount of such interest computed on the basis of the Contract Rate would exceed the amount of such interest computed upon the basis of the maximum rate of interest permitted by applicable state or federal law in effect from time to time hereafter (the "Maximum Legal Rate"), the interest payable under this Agreement shall be computed upon the basis of the Maximum Legal Rate, but any subsequent reduction in the Contract Rate shall not reduce such interest thereafter payable hereunder below the amount computed on the basis of the Maximum Legal Rate until the aggregate amount of such interest accrued and payable under this Agreement equals the total amount of interest which would have accrued had such interest been at all times computed solely on the basis of the Contract Rate; and (ii) unless preempted by federal law, the Contract Rate from time to time in effect hereunder may not exceed the maximum rate of interest permitted under Oklahoma law, unless the determination of the maximum rate of interest is preempted by federal law.

(C)     No agreements, conditions, provisions or stipulations contained in this Agreement or any Other Agreements between Borrower and Lender or default of Borrower, or the exercise by Lender of the right to accelerate the Liabilities, or to exercise any option whatsoever contained in this Agreement or any Other Agreement between Borrower and Lender, or the arising of any contingency whatsoever, shall entitle Lender to collect, in any event, interest exceeding the Maximum Legal Rate and in no event shall the Borrower be obligated to pay interest exceeding such Maximum Legal Rate and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay a rate of interest exceeding the Maximum Legal Rate, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest over such Maximum Legal Rate. In the event any interest is charged in excess of the Maximum Legal Rate ("Excess"), Borrower acknowledges and stipulates that any such charge shall be the result of an accident and bona fide error, and such Excess shall be, first, applied to reduce the principal then unpaid hereunder; second, applied to reduce the Liabilities; and third, returned to Borrower, it being the intention of the Parties hereto not to enter at any time into a usurious or otherwise illegal relationship. Borrower recognizes that, with fluctuations in the Contract Rate and

the Maximum Legal Rate, such an unintentional result could inadvertently occur. By the execution of this Agreement, Borrower covenants that (i) the credit or return of any Excess shall constitute the acceptance by Borrower of such Excess, and (ii) Borrower shall not seek or pursue any other remedy, legal or equitable, against Lender based, in whole or in part, upon the charging or receiving of any interest in excess of the maximum authorized by applicable law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Lender, all interest at any time contracted for, charged or received by Lender in connection with this Agreement, shall be amortized, prorated, allocated and spread in equal parts during the entire term of this Agreement.

(D)     The provisions of Section 2.5(C) shall be deemed to be incorporated into every document or communication relating to the Liabilities which sets forth or prescribes any account, right or claim or alleged account, right or claim of Lender with respect to Borrower (or any other obligor in respect of Liabilities), whether or not any provision of Section 2.5(C) is referred to therein.

(E)     If the applicable state or federal law is amended in the future to allow a greater rate of interest to be charged under this Agreement or the Other Agreements than is presently allowed by applicable state or federal law, then the limitation of interest hereunder shall be increased to the maximum rate of interest allowed by applicable state or federal law as amended, which increase shall be effective hereunder on the effective date of such amendment, and all interest charges owing to Lender by reason thereof shall be payable in the event of default or upon the Termination Date, whichever occurs first.

2.6     Computation of Interest. Subject to the limitations provided above, interest on the Revolving Credit Note shall be computed on the basis of actual days elapsed and a 360-day year. The Prime Rate in effect shall be determined by Lender on a daily basis, with adjustments to such Prime Rate to be made on the same date as any change in the Prime Rate is determined by Lender, which rate shall be used in computing the Contract Rate which is payable until the next announced change in the Prime Rate.

2.7     Loan Purpose. Borrower shall use the proceeds of any advances and re-advances made under this Agreement by Lender to Borrower for the purposes of working capital needs of Borrower and other uses permitted under this Agreement, which uses shall be only for legal and proper purposes (duly authorized in accordance with its governing documents) which are consistent with the terms of this agreement and all applicable laws and statutes.

2.8     All Advances to Constitute One Loan. All evidences of credit, loans and advances made by Lender to Borrower under this Agreement and the Other Agreements shall constitute one loan and all indebtedness and obligations of Borrower to Lender under this Agreement and all Other Agreements shall constitute one general obligation secured by Lender's security interest in all of the Collateral and by all other security interests, liens, claims and encumbrances heretofore, now, or at any time or times hereafter granted by Borrower to Lender or otherwise acquired by Lender. Borrower agrees that all of the rights of Lender set forth in this Agreement shall apply to any modification of or supplement to this Agreement and the Other Agreements. In the event there are affiliated companies collectively designated as Borrower, it is specifically agreed that Lender may make loans and advances to any one of such affiliated companies collectively designated as Borrower, and such loans and advances shall be deemed a loan and advance to all of the affiliated companies.

2.9     Monthly Accountings. Lender will provide Borrower monthly with a statement of advances, charges and payments made pursuant to this Agreement and the Revolving Credit Note and such account rendered by Lender shall be deemed binding unless Lender is notified in writing to the contrary within thirty (30) days after each account rendered.



## 3. PAYMENT OF LIABILITIES

3.1   Payments.  All payments to Lender shall be payable at Lender's address set forth in this Agreement or at such other place or places as Lender from time to time may designate in writing to Borrower.

(A)  Interest payable pursuant to this Agreement shall be due on the first day of each month (for the immediately preceding month) unless Lender sooner demands payment as permitted in this Agreement;

(B)  Costs, fees and expenses payable pursuant to this Agreement shall be payable by Borrower to Lender or to such other Person(s) designated by Lender in writing, on demand;

(C)  Principal, payable on account of loans or advances made by Lender to Borrower under the Revolving Credit Note shall be due and payable on or before the expiration of the term specified in Section 2.3 unless sooner demanded as a result of termination or default; provided, however, that prior to the time determined for payment all collections received by Lender with respect to any proceeds of the Collateral which are not applied to interest shall be applied against the principal, subject to the provisions of Section 3.2 below.

(D)  The balance of the Liabilities, if any, shall be payable by Borrower to Lender as and when provided in this Agreement or the Other Agreements or upon an Event of Default or on the Termination Date, whichever first occurs.

3.2   Receipt of Payment.  In the event Borrower (which for purposes of this Section shall include its Affiliates, owners, directors, officers, employees, agents or those Persons acting for or in concert with Borrower) shall receive any cash, checks, notes, drafts or any other payment relating to and/or proceeds of the Collateral, no later than the first business day following receipt thereof, Borrower shall deliver the same or cause the same to be delivered to Lender, at Lender's address set forth in this Agreement, for application on account of the Liabilities as provided in Section 3.3 below, until such time as Lender has established a depository account at a bank for the deposit of such payments, and, thereafter, Borrower shall (a) deposit or cause the same to be deposited, in kind, in the special account so established by Lender for application on account of the Liabilities as provided in Section 3.3 below and (b) maintain copies of checks and, upon request, forward to Lender, on a daily basis, copies of all checks or other items of payment and deposit slips related thereto, together with a collection report in form and substance satisfactory to Lender. All cash payments and all checks, drafts, or similar items of payment by or for the account of Borrower shall be the sole and exclusive property of Lender immediately upon the earlier of the receipt of such items by Lender or the receipt of such items by Borrower. Borrower agrees that its shall hold any such cash, checks, notes, drafts or any other payment relating to and/or proceeds of the Collateral in trust and safekeeping for Lender separate from the Company's other property and funds pending delivery or deposit thereof as set forth in this Section. Borrower further acknowledges and agrees that any negotiation or other handling of such items other than as required to deliver the same to the account of Lender as set forth in this Section shall be deemed conversion of such items and may subject Borrower to civil and/or criminal liability and, without thereby waiving pursuit of any other remedy for default, shall entitle Lender to a fee of 25% of the amount of any such item converted to cash or cash equivalents in compensation for the expenses of Lender occasioned by such conversion. Borrower further acknowledges and agrees that Borrower's liability arising from such conversion and the breach of its obligation to hold such items in trust may not be dischargeable in bankruptcy or any other insolvency proceeding. Provided, however, that (i) for the purpose of computing interest hereunder such items shall be applied by Lender on account of the Liabilities five business days after same have been deposited into Lender's operating bank account; and (ii) no such item received by Lender shall constitute payment to Lender unless such item is actually collected by the bank at which Lender maintains its operating account and such collection is credited to Lender's account. In the event Borrower elects to deliver to Lender on account of the Liabilities payment other than by good funds, such payment shall be applied by Lender on account of the Liabilities five business days after the date the same is deposited into Lender's operating bank account. Notwithstanding anything to

the contrary herein, all such items of payment shall, solely for the purpose of determining the occurrence of an Event of Default, be deemed received upon actual receipt by Lender, unless the same is subsequently dishonored for any reason whatsoever. All payments made by or on behalf of and all credits due any Borrower may be applied and reapplied in whole or in part to any of the Liabilities to the extent and in the manner Lender deems advisable in its sole discretion.

     3.3    Application of Payments and Collections. Borrower irrevocably waives the right to direct the application of any and all payments and collections at any time or times hereafter received by Lender from or on behalf of Borrower, and Borrower does hereby irrevocably agree that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time or times hereafter by Lender or its agent against the Liabilities, in such manner as Lender may deem advisable in its sole discretion, notwithstanding any entry by Lender upon any of its books and records.

4.     GRANT OF SECURITY INTEREST.

     4.1    Security Interest. To secure the prompt payment, performance and observance in full of all Liabilities, Borrower hereby grants to Lender a continuing security interest in, a lien upon, and a right of setoff against all present and future accounts, instruments, documents, chattel paper, general intangibles, deposit accounts, investment property, commercial tort claims, letter of credit rights, letters of credit, inventory, machinery, and equipment, whether now owned or existing, hereafter acquired or arising, or in which Borrower now or hereafter has any rights, and where so ever located, including without limitation: (a) all Accounts, whether now existing or hereafter arising; all chattel paper, documents and instruments, whether now existing or hereafter arising relating to Accounts; and all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to Accounts or such chattel paper, documents, and instruments; (b) all General Intangibles of any kind, whether now existing or hereafter arising; all chattel paper, documents and instruments whether now existing or hereafter arising relating to General Intangibles; and all rights now or hereafter existing in and to all security agreements, leases, and contracts securing or otherwise relating to General Intangibles or such chattel paper, documents, and instruments; (c) all inventory in all of its forms, whether now owned or hereafter acquired and wherever located; and all accessions or additions thereto, products thereof, whether now owned or hereafter acquired; (d) all goods, machinery, equipment, furniture, and fixtures in all of its forms, whether now owned or hereafter acquired and wherever located; all parts thereof; attachments, accessions, and additions thereto; and all replacements and substitutions therefor; and (e) the proceeds, products, additions to, substitutions for and accessions of any property described in subparagraphs (a), (b), (c) and (d) above.

     4.2    Verification of Accounts: Inspection: Audit. Any of Lender's officers, employees or agents shall have the right, at any time hereafter, in Lender's name, in the name of a certified public accounting firm, or in the name of Borrower, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone or otherwise. Lender (by any of its officers, employees or agents) shall have the right, at any time, during Borrower's usual business hours, to inspect any of the business locations or premises of Borrower, the Collateral, all records related to the Collateral (and to make extracts from such records), the premises upon which any of the Collateral is located, and all books and records relating to the Borrower's Collateral or the collection thereof as well as those relating to Borrower's general business and financial condition, and the right, at any time, to discuss Borrower's affairs and finances and the Collateral with any attorney, accountant, Account Debtor or creditor of Borrower.

5.     GENERAL WARRANTIES AND REPRESENTATIONS

     5.1    General Warranties and Representations. Borrower warrants and represents that during the term of this Agreement and so long as any of the Liabilities remain unpaid:

(A)     Borrower is a Florida limited liability company duly organized and existing and in good standing under the laws of the jurisdiction of its formation set forth above, qualified or licensed to do business in all other jurisdictions in which Borrower does business which require Borrower to be so qualified or licensed;

(B)     Borrower is in compliance with all requirements of law except to the extent that the failure to comply therewith would not, in the aggregate, have a material adverse effect on the business, operations, property or financial or other condition of Borrower and would not materially adversely affect the ability of Borrower to perform its obligations under this Agreement, the Revolving Credit Note and the Other Agreements;

(C)     Borrower has not, during the preceding five (5) years, used any other business location or been known as or used any other corporate or fictitious name, except as disclosed to Lender;

(D)     Borrower has the requisite power and authority to make, deliver and perform this Agreement, the Revolving Credit Note, and the Other Agreements and has taken necessary action to authorize the borrowings on the terms and conditions of this Agreement, the Revolving Credit Note, and the Other Agreements;

(E)     Borrower's use of the proceeds of any advances and re-advances made by Lender to Borrower pursuant to this Agreement are, and will continue to be, legal and proper uses (duly authorized in accordance with its governing documents) and such uses are consistent with all applicable laws and statutes, as now or hereafter in effect;

(F)     Borrower possesses and is in compliance with the terms of all governmental approvals, permits, certificates, inspections, consents and franchises necessary to continue to conduct its business as heretofore conducted by it and to own or lease and operate its properties as now owned or leased by it, and none of said governmental approvals, permits, certificates, inspections, consents or franchises contain any term, provision, condition or limitation more burdensome than such as are generally applicable to Persons engaged in the same or similar business as Borrower;

(G)     Borrower possesses adequate assets, licenses, patents, patent applications, copyrights, trademarks, trademark applications, service marks, service mark applications and trade names to continue to conduct its business;

(H)     Borrower now has capital sufficient to carry on its business and transactions and all businesses and transactions in which it is about to engage and is now solvent and able to pay its debts as they mature and Borrower now owns property whose fair saleable value is greater than the amount required to pay its debts;

(I)     There are no controversies pending or threatened between Borrower and any of its employees (other than employee grievances arising in the ordinary course of business) which are, in the aggregate, material to the continued financial success and well-being of Borrower;

(J)     The most recent financial statement of Borrower fairly presents the assets, liabilities, and financial condition and results of operations of Borrower and such other Persons described therein as of the date thereof, in accordance with generally accepted accounting principles applied on a consistent basis, and there are no omissions or other facts or circumstances which are or may be material. There has been no material and adverse change in the assets, liabilities or financial condition of Borrower since the date of such financial statement; there exist no equity or long term investments in or outstanding advances to any Person not reflected in the financial statements; except for those disclosed in the financial statements. Borrower has not guaranteed the obligations of any other Person. Each such financial statement, including the related schedules and notes thereto, has been prepared in accordance with generally accepted accounting

principles applied consistently throughout the periods involved (except as disclosed in the respective statement or in said letter);

(K) Borrower is not a party to any contract or agreement or subject to any charge, restriction, judgment, decree or order which does or which will materially and adversely affect its business, property, assets, operations or condition, financial or otherwise, is not a party to any labor dispute, and there are no strikes or walkouts relating to any labor contracts and no such contract is scheduled to expire during the term of this Agreement;

(L) No litigation, investigation or proceeding of or before any arbitrator or governmental authority is pending or threatened by or against Borrower or any of its Affiliates which, if adversely determined, would have a material adverse effect on the business, operations, property or financial or other condition of the Borrower and its Affiliates taken as a whole;

(M) Borrower is not nor will it be in violation of any applicable statute, regulation or ordinance of any governmental entity, including, without limitation, the United States of America, any state, city, town, municipality, county or of any other jurisdiction, or of any agency thereof, in any respect materially and adversely affecting the Collateral or its business, property, assets, operations or condition, financial or otherwise;

(N) Borrower has filed or caused to be filed all tax returns which are required to be filed, and has paid all taxes shown to be due and payable on said returns or on any assessments made against it and all other taxes, fees or other charges imposed on it by a governmental authority (other than those the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with generally accepted accounting principles have been provided on the books of Borrower); and no tax liens have been filed and no assessments are being asserted or threatened with respect to any such taxes, fees or other Charges;

(O) No representations, warranties or any other statements made by Borrower or, to the best knowledge of Borrower, or any other party, in this Agreement, any Other Agreement, or in any other document referred to herein or furnished from time to time in connection herewith contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements herein or therein not misleading;

(P) Except for the Lien granted to Lender pursuant to this Agreement or the Liens permitted under Section 6.2(I) hereof, Borrower is the sole owner of each item of the Collateral pledged by it, having good, indefeasible and marketable title thereto, free and clear of any and all Liens. No amounts payable under or in connection with any of the Accounts are evidenced by promissory notes or other instruments;

(Q) No security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office, except such as may have been filed (i) by Borrower in favor of Lender pursuant to this Agreement or (ii) in respect of the items of Collateral subject to the Liens permitted under Section 6.2(I); and

(R) Borrower's Federal Employment Identification Number is 27-0630071.

(Q) Neither Borrower nor any of its Affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, nor any Account Debtor is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute,

ACCOUNTS RECEIVABLE FINANCE AGREEMENT - Page No. 10    Rev. 0315    Initials

executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action

    5.2    <u>Reaffirmation of Warranties and Representations.</u> Each request for an advance made by Borrower pursuant to this Agreement or the Other Agreements shall constitute (i) a warranty and representation by Borrower to Lender that there does not then exist an Event of Default or any event or condition which, with notice, lapse of time or both and/or the making of such advance, would constitute an Event of Default and (ii) a reaffirmation as of the date of said request of all of the representations and warranties of Borrower contained in this Agreement or the Other Agreements as if such representations and warranties were made on the date of such request.

    5.3    <u>Survival of Warranties and Representations.</u> Borrower covenants, warrants and represents to Lender that all representations and warranties of Borrower contained in this Agreement and the Other Agreements shall be true at the time of Borrower's execution of this Agreement and the Other Agreements, shall survive the execution, delivery and acceptance thereof by the parties thereto and the funding of the transactions described therein or related thereto, and the payment of the Liabilities. Borrower and Lender expressly agree that any misrepresentation or breach of any warranty whatsoever contained in this Agreement or the Other Agreements shall be deemed material.

## 6.    GENERAL COVENANTS AND OTHER AGREEMENTS

    6.1    <u>Affirmative Covenants.</u> Borrower covenants that it shall:

    (A)    Keep books of account and prepare financial statements and shall cause to be furnished to Lender the following (all of the foregoing and following to be kept and prepared in accordance with generally accepted accounting principles, unless Borrower's certified public accountants concur in any changes therein and such changes are disclosed to Lender and consistent with then generally accepted accounting principles): (i) as soon as available, but not later than ninety (90) days after the close of each fiscal year of Borrower hereafter, financial statement of Borrower and its subsidiaries on a consolidated basis, including balance sheet and income statement, as of the end of such year; (ii) as soon as available, but not later than thirty (30) days after the end of each month hereafter, an unaudited consolidated and consolidating monthly financial statement of Borrower and its subsidiaries as at the end of the portion of Borrower's fiscal year then elapsed, a balance sheet and a year-to-date income statement, and five (5) days after the end of each month hereafter, an aging of accounts receivable, an aging of accounts payable, and an Account Debtor name and address listing, all prepared in accordance with generally accepted accounting principles and fairly presenting the consolidated and consolidating financial position and results of operations of Borrower and its subsidiaries for such period; (iii) concurrently with the filing or delivery thereof, all required federal securities reports and statements, as well as all reports to shareholders; and (iv) such other data and information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to the Collateral, Borrower's financial condition and/or results of operations;

    (B)    Notify Lender in writing, within three (3) business days after learning thereof, of any litigation whether or not the claim is considered by Borrower to be covered by insurance, and of the institution of any suit or administrative proceeding which may materially and adversely affect the operations, condition (financial or other) or business of Borrower and its Affiliates taken as a whole, or Lender's Liens on, and security interest in, the Collateral, or rights pursuant to any Other Agreement;

    (C)    File all federal, state and local tax returns (providing copies to Lender) and other reports Borrower is required by law to file, maintain adequate reserves for the payment of all taxes,

Initial 

assessments, governmental charges, and other similar charges, and pay promptly, when due, all such taxes, assessments, and other charges;

(D)     Provide Lender with copies of all agreements between Borrower or any of its Affiliates and any warehouse at which inventory may, from time to time, be kept and all leases or similar agreements between Borrower or any of its Affiliates and any other Person, whether Borrower or its Affiliate is lessor or lessee thereunder;

(E)     Notify, and shall cause each of its Affiliates to notify, Lender in writing, (i) within three (3) days after the creation thereof, of each Lien permitted by Section 6.2(I) hereof and (ii) promptly upon obtaining possession of any property subject to a Lien permitted by Section 6.2(I) hereof of the date Borrower obtains such possession;

(F)     Maintain the Collateral, as the same is constituted from time to time, free and clear of all liens, claims, security interests and encumbrances, except those held by Lender and any Lien permitted by Section 6.2(I) hereof;

(G)     Within thirty (30) days after the date of this Agreement, (i) properly file, register and record each document (including, without limitation, UCC financing statements, control agreements and applications for certificates of title) required or, in Lender's or Lender's counsel's opinion, advisable to be filed, registered or recorded in order to perfect a Lien on the Collateral in each office in each jurisdiction in which such filings, registration and recordation are required; (ii) cause Lender's Lien to be noted on each document of ownership or title as to which evidence of Lender's Lien is necessary or, in Lender's or Lender's counsel's opinion, advisable to be shown in order to perfect Lender's Lien on the Collateral covered by such document; (iii) furnish to Lender acknowledgment copies of all such filings, registrations and recordation stamped by the appropriate filing, registration or recording officer, and evidence that all necessary filing subscription and inscription fees and all recording and other similar fees, and all taxes and other expenses related to such filings, registrations, recordings and notations have been paid in full by or on behalf of Borrower;

(H)     Notify Lender in writing, promptly upon its learning thereof, of any event or occurrence which might constitute a breach or Event of Default by any Borrower under the representations, warranties and covenants herein given;

(I)     Do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights and franchises and comply with all laws applicable to it; maintain Borrower's qualification and good standing in all states in which such qualification and good standing are necessary in order for Borrower to conduct its business and own its property as conducted and owned in such states; continue to conduct its business substantially as now and proposed to be conducted; and at all times maintain, preserve and protect all franchises, trade names, copyrights, trademarks, assets, licenses, patents to conduct its business substantially as heretofore conducted by it, and preserve all the remainder of its property in use or useful in the conduct of its business and keep the same in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals and replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly and advantageously conducted at all times;

(J)     Except as otherwise provided herein, Borrower shall (i) pay and discharge or cause to be paid and discharged all its Indebtedness and other obligations (other than indebtedness or obligations contested in good faith) as and when due and payable (but will not prepay any such Indebtedness or other obligations without Lender's prior written consent) and (ii) pay and discharge or cause to be paid and discharged promptly all Liens, taxes and Charges, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a Lien upon such properties or any

part thereof (other than Liens, taxes, and Charges the amount or validity of which is being contested in good faith);

(K)   Advise Lender, by written notice delivered to Lender at least thirty (30) days prior thereto, of Borrower's opening of any new office or place of business or Borrower's closing of any existing office or place of business;

(L)   Notify Lender in writing, promptly upon Borrower's learning thereof, of any material labor dispute to which Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which Borrower is a party or by which Borrower is bound;

(M)   Comply with all laws, statutes, regulations and ordinances of any governmental entity, or of any agency thereof, applicable to Borrower a violation of which, in any respect, may materially and adversely affect the Collateral or Borrower's business, property, assets, operations or condition, financial or otherwise;

(N)   Notify Lender in writing, within five (5) business days after occurrence thereof, of Borrower's default under any note, indenture, loan agreement, mortgage, lease, deed or other similar agreement to which Borrower is a party or by which Borrower is bound;

(O)   Borrower shall notify Lender, in writing, within ten (10) days of the change of its name or use of any trade names or division names not previously disclosed to Lender in writing;

6.2   **Negative Covenants.** Without Lender's prior written consent, which Lender may or may not, in its sole discretion, give concurrently herewith or hereafter, Borrower covenants that it shall not:

(A)   Acquire by any means any additional assets during any fiscal year, excluding only fixed assets, Accounts and inventory;

(B)   Make any investment in the securities of any Person, nor make any other investment other than in cash equivalents and Accounts, contract rights and notes receivable arising in the ordinary course of business;

(C)   During any fiscal year, purchase, acquire, retire, call or redeem or make any commitment to purchase, acquire, retire, call or redeem any ownership interest in Borrower, declare or pay any dividends or distributions thereon, make any distributions of Borrower's property or assets or make any loans, advances and/or extensions of credit to any Persons;

(D)   Except as previously disclosed to Lender, make any loans or other advances of money (other than salary) to officers, directors, stockholders, Affiliates of Borrower or any Persons;

(E)   Make any material change in Borrower's capital structure or in any of its business objectives, purposes and operations which might in any way adversely affect the repayment of the Liabilities;

(F)   Directly or indirectly purchase, acquire or lease any property from, or sell, transfer or lease any property to, or lend or advance any money to, or borrow any money from, or securities of, or enter into any merger or consolidation agreement, or any management consulting fee arrangement or enter into, or be a party to, any other transaction or otherwise deal with any Affiliate, owner, officer, employee, manager, director (or other Person having governing authority over Borrower) of Borrower, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms which are fully disclosed at least ten (10) business days in advance to Lender;

ACCOUNTS RECEIVABLE FINANCE AGREEMENT - Page No. 13     Rev. 0315                Initials

(G)   Enter into any transaction which materially and adversely affects the Collateral or Borrower's ability to repay the Indebtedness or permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature with respect to any Account, including any of the terms relating thereto;

(H)   Guarantee or otherwise, in any way, become liable with respect to the obligations or liabilities of any Person, except (i) the Liabilities, and (ii) by endorsement of instruments or items of payment for deposit to Borrower's general account or for delivery to Lender on account of Liabilities;

(I)   Except as otherwise expressly permitted herein or in the Other Agreements, encumber, pledge, mortgage, grant a security interest in, assign, sell, lease or otherwise dispose of or transfer, any of the Borrower's assets other than (i) Liens in favor of the Lender, (ii) Liens securing purchase-money debt (other than for inventory) up to the amount permitted in accordance with Section 6.2(J) hereof, but not encumbering any assets other than those acquired with the proceeds of such purchase-money debt, (iii) Liens for property taxes not yet due and (iv) materialmen's, mechanics', workmen's, repairmen's, employees' or similar Liens arising against Borrower or any of its Affiliates in the ordinary course of business, in each case which are either not delinquent or are being contested in good faith and by appropriate proceedings conducted with due diligence (so long as such proceedings do not involve any risk of the sale, forfeiture or loss of any material portion of the property of Borrower or such Affiliate or any interest therein) and for the payment of which adequate reserves have been provided; (v) deposits to secure payment of workmen's compensation, unemployment insurance and other social security benefits; and (vi) statutory or judgment liens being contested in good faith by appropriate proceedings and for the payment of which adequate reserves have been provided;

(J)   Create, assume or suffer to exist any Indebtedness for borrowed money or issue or sell any obligation of the Borrower (whether absolutely, contingently or otherwise), excluding only: (i) the debt evidenced by the Note; (ii) accounts payable and accrued liabilities arising in the ordinary course of Borrower's business; (iii) the execution of bonds, undertakings or contracts and obligations for trade payables in the usual course of Borrower's business which are not for the purpose of obtaining money; and (iv) indebtedness purchase-money debt incurred for the acquisition of fixed assets;

(K)   (i) Remove its books and records or the Collateral from the locations noted in Schedule B except (a) for removal of inventory upon its sale in the ordinary course of business and (b) for Equipment (if applicable) to the extent permitted herein or (ii) keep any of such books and records at any other office(s) or location(s) unless Borrower gives Lender written notice thereof and of the new location of said books and records at least thirty (30) days prior thereto and such other office or location is within the continental United States of America;

(L)   Make any change in the date of its fiscal year end; or

(M)   Direct, receive or deposit the proceeds of Collateral into any account other than Lender's.

6.3   Contesting Charges. Notwithstanding anything to the contrary herein, Borrower may dispute any Charges without prior payment thereof, even if such non-payment may cause a Lien to attach to Borrower's assets, provided that Borrower shall have given Lender written notice of said dispute and shall be diligently contesting the same in good faith in an appropriate proceeding and, provided further that, if the same are in excess of $5,000.00 in the aggregate at any time or times hereafter, Borrower has given Lender such additional collateral and assurances as Lender, in its sole discretion, deems necessary under the circumstances.

6.4    Payment of Charges. Subject to the provisions of Section 6.3 above, Borrower shall pay promptly when due all of the Charges. In the event Borrower, at any time or times hereafter, shall fail to pay the Charges or to promptly obtain the discharge of such Charges, Borrower shall so advise Lender thereof in writing and Lender may, without waiving or releasing any obligation or liability of Borrower hereunder or any Event of Default, in its sole discretion, at any time or times thereafter, make such payment, or any part thereof, or obtain such discharge and take any other action with respect thereto which Lender deems advisable. All sums so paid by Lender and any expenses, including reasonable attorney's fees, court costs, expenses and other charges relating thereto, shall be payable, upon demand, by Borrower to Lender and shall be additional Liabilities hereunder secured by the Collateral. Lender shall be subrogated to the rights of the payee of any such sums.

6.5    Survival of Obligations Upon Termination of Agreement. Except as otherwise expressly provided for in this Agreement and in the Other Agreements, no termination or cancellation (regardless of cause or procedure) of this Agreement or the Other Agreements shall in any way affect or impair the powers, obligations, duties, rights, and liabilities of Borrower or Lender in any way or respect relating to: (a) any transaction or event occurring prior to such termination or cancellation; (b) the Collateral; and/or (c) any of the undertakings, agreements, covenants, warranties and representations of Borrower or Lender contained in this Agreement or the Other Agreements. All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

7.    ACCOUNTS:    WARRANTIES    AND    REPRESENTATIONS,    COVENANTS    AND MISCELLANEOUS TERMS.

7.1    Account Warranties and Representations. With respect to Accounts, Borrower warrants and represents to Lender that during the term of this Agreement and so long as any of the Liabilities remain unpaid: (a) in determining which Accounts are Eligible Accounts on any Schedule of Accounts, Lender may rely upon all statements or representations made by Borrower on Schedules of Accounts at the time said Schedule of Accounts is provided to Lender and so long as there are any Liabilities outstanding, unless otherwise expressly indicated by Borrower to Lender in writing; and (b) those Accounts designated as Eligible Accounts on any Schedule of Accounts meet each eligibility requirement at the time said Schedule of Accounts is provided to Lender.

7.2    Covenants with Respect to Accounts.

(A)    Assignments, Records and Schedules of Accounts. Borrower shall execute and deliver to Lender written assignments of all of its Accounts no less often than weekly, together with copies of invoices, proof of delivery or acceptance of services provided, and purchase orders related thereto. Borrower shall keep accurate and complete records of its Accounts and within five (5) days of the last day of each month from and after the date hereof, Borrower shall deliver to Lender, in form and substance acceptable to Lender, a detailed aged trial balance of all then existing Accounts specifying the face value and dates of invoice(s) for each Account Debtor (identified by name and address) obligated on an Account so listed and which of such Accounts are Eligible Accounts ("Schedule of Accounts"), copies of customer statements and, upon demand, the original copy of all documents, including, without limitation, repayment histories and present status reports, relating to the Accounts so scheduled and such other matters and information relating to the status of then existing Accounts as Lender shall reasonably request. Borrower shall not re-date any invoice or sale or make sales on payment terms dating beyond, or otherwise less favorable to Borrower than, that customary in Borrower's industry. If Borrower becomes aware of anything materially detrimental to Borrower's customers' credit, Borrower shall promptly advise Lender thereof.

Borrower understands that the submission of Account assignments to Lender is to allow Lender to monitor the Borrowing Base and does not affect or limit Lender's security interest in the Collateral. Failure by Borrower to submit the Account assignments shall, at Lender's option, constitute an Event of Default hereunder;

(B)     Notice Regarding Disputed Accounts. In the event any amounts due and owing in excess of $5,000.00 are in dispute between any Account Debtor and Borrower, Borrower shall provide Lender with written notice thereof at the time of submission of the next collateral report pursuant to Section 7.2(A) above, explaining in detail the reason for the dispute, all claims related thereto and the amount in controversy. In the event any Account becomes evidenced by a promissory note, trade acceptance or any other instrument for the payment of money, Borrower shall immediately thereafter deliver such instrument to Lender, appropriately endorsed to Lender, and, regardless of the form of presentment, demand, notice of dishonor, protest and notices of protest with respect thereto;

(C)     Duty to Inform Lender about Defenses, Offsets, Credits, Etc. Unless Lender notifies Borrower in writing that Lender suspends any one or more of the following requirements, promptly upon, but in no event later than three (3) business days after: (i) Borrower's learning thereof, inform Lender, in writing, of any material delay in Borrower's performance of any of its obligations to any Account Debtor and of any assertion of any claims, offsets or counterclaims by any Account Debtor and of any allowances, credits and/or other monies granted by Borrower to any Account Debtor; (ii) Borrower's receipt or learning thereof, furnish to an inform Lender of all material adverse information relating to the financial condition of any Account Debtor;

(D)     Conversion of Eligible Accounts into Ineligible Accounts. Borrower shall notify Lender in writing within three (3) business days after, Borrower's learning thereof, in the event any Eligible Account becomes or could reasonably be expected to become ineligible and of the reason(s) for such ineligibility.

7.3     Eligible Accounts. Upon the delivery to Lender of a Schedule of Accounts as described in Section 7.2(A) hereof, Lender shall make a determination, in the exercise of its sole discretion, as to which Accounts are to be Eligible Accounts.

7.4     Collections; Lender's Right to Notify Account Debtors and to Endorse Borrower's Name. Borrower hereby authorizes Lender, now and at any time or times hereafter, to (i) open Borrower's mail and collect any and all amounts due to Borrower from Account Debtors, including, without limitation, endorsing Borrower's name, (ii) notify or direct the Borrower to notify any or all Account Debtors that the Accounts have been assigned to Lender and that Lender has a security interest therein and (iii) direct or cause the Borrower to direct such Account Debtors to make all payments due from them to Borrower upon the Accounts directly to Lender or to a lock box or similar account designated by Lender. Lender shall promptly furnish Borrower with a copy of any such notice sent and Borrower hereby agrees that any such notice, in Lender's sole discretion, may be sent on Borrower's stationery, in which event, Borrower shall co-sign such notice with Lender.

## 8.     CONDITIONS PRECEDENT

8.1     Conditions of Initial Loan. The obligation of Lender to make any loan under the Agreement on the Closing Date is subject to the satisfaction of the following conditions precedent: (a) Lender shall have received the Revolving Credit Note conforming to the requirements hereof; (b) All Uniform Commercial Code financing statements required or, in Lender's opinion, advisable to be filed in order to create, in favor of the Lender, a perfected Lien on the Collateral with respect to which a Lien can be perfected by means of filing a Uniform Commercial Code financing statement (or for the filing of an application for certificate of title), shall have been properly filed in each office in each jurisdiction in which such filings are required or, in Lender's opinion, advisable; and (c) All other documents and legal matters in connection with the



ACCOUNTS RECEIVABLE FINANCE AGREEMENT – Page No. 16     Rev. 0315

transactions contemplated by the Agreement and the Other Agreements shall be satisfactory in form and substance to Lender and its counsel.

## 9.   EVENTS OF DEFAULT: RIGHTS AND REMEDIES ON DEFAULT

9.1   Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default": (a) Borrower fails to pay the Liabilities when due and payable or declared due and payable or is in default in the payment of all or any portion of the Indebtedness or Borrower fails or neglects to perform, keep or observe any other term, provision, condition, covenant, warranty or representation contained in this Agreement or in the Other Agreements, which is required to be performed, kept or observed by Borrower; (b) Borrower fails to: (i) deposit in the special account any proceeds of Collateral in strict compliance with the requirement of Section 3.2 hereof, or (ii) to comply fully with Section 4.2 hereof; (c) a default shall occur under any agreement, document or instrument (subject to any right to cure therein), other than this Agreement, hereafter existing, to which Borrower is a party; (d) any statement, report, financial statement, or certificate made or delivered by Borrower, or any of its officers, employees or agents, to Lender is not true and correct, in any material respect; (e) there shall occur any material uninsured damage to or loss, theft, or destruction of any of the Collateral; (f) the Collateral or any other assets of Borrower or any of its Affiliates shall be attached, seized, levied upon subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not cured within thirty (30) days thereafter; or if a decree or order is rendered by a court having jurisdiction for the appointment of a receiver, trustee, or custodian for any assets of Borrower or any of its Affiliates and the same is not dismissed within thirty (30) days after the application therefor; (g) an application is made by or against Borrower for relief under any section or chapter of the Bankruptcy Code or any similar State or Federal law or regulation or Borrower makes an assignment for the benefit of its creditors; (h) Borrower ceases to, conduct its business as now conducted without the Lender's consent or is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business affairs; (i) except as permitted herein, a notice of lien, levy or assessment is filed of record with respect to all or any of Borrower's assets by the United States, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency or if any taxes or debts owing at any time or times hereafter to any one of them becomes a lien or encumbrance upon the Collateral or any other or Borrower's assets and the same is not released within thirty (30) days after the same becomes a lien or encumbrance; or (j) Borrower becomes insolvent; has suspended the transaction of its usual business or is generally not paying its debts as they become due evidenced by Borrower's admission in writing or otherwise; (k) the occurrence of any material and adverse change in the business operations and condition, financial or otherwise, of Borrower or any guarantor of the Liabilities; (l) any guarantor of the Liabilities shall be in default under any agreement to which it is a party, or demand is made on any such guarantor under the terms of any guaranty agreement to which such guarantor is a party; (m) there shall be any material, adverse change from the present consolidated condition or affairs (financial or otherwise) of the Borrower and/or the guarantor that, in the Lender's reasonable opinion, impairs its Collateral or increases its risk; or (n) there shall occur any change in the ownership of the stock of the Borrower.

9.2   Default Rate of Interest. Upon and after an Event of Default, including, but not limited to, a breach of the covenants hereunder, the Liabilities shall continue to bear interest, calculated daily on the basis of a 360-day year at a rate of interest equal to the Default Rate (both before and after judgment) until paid in full, or the Event of Default is cured, provided, however, that the default rate of interest shall in no event be in excess of the Maximum Legal Rate.

9.3   Acceleration of the Liabilities. Upon the occurrence of any Event of Default of the kind referred to in any of paragraphs (g), (h), or (i) of Section 9.1 all of the Liabilities (and accrued interest thereon) shall automatically and without demand, notice or legal process of any kind, become due and payable and the Revolving Credit Commitment shall automatically terminate. Upon the occurrence and

continuation of any other Event of Default, all of the Liabilities (and accrued interest thereon) may, at the option of Lender upon notice to Borrower be declared, and immediately shall become due and payable and the Revolving Credit Commitment may, at the option of Lender upon notice to Borrower, be terminated. Notwithstanding any termination, until all of Borrower's Liabilities to Lender of every nature whatsoever shall have been fully paid and satisfied, Lender shall be entitled to retain its security interest in and to all existing and future Collateral and Borrower shall continue to turn over all collections of Accounts and proceeds of other Collateral to Lender for application on the Liabilities.

9.4   Remedies.   Upon and after an Event of Default, Lender shall have the following rights and remedies: (a) All of the rights and remedies of a secured party under the UCC or other applicable law, all of which rights and remedies shall be cumulative, and non exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement and in all of the Other Agreements; (b) The right to open mail to Borrower or any of its Affiliates and collect any and all amounts due Borrower from Account Debtors; (c) The right to (i) enter upon the premises of Borrower or any of its Affiliates, without any obligation to pay rent, through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, or any other place or places where the Collateral is located and kept, and remove the Collateral therefrom to the premises of Lender or any agent of Lender, for such time as Lender may desire, in order to effectively collect or liquidate the Collateral, and/or (ii) require Borrower and its Affiliates to assemble the Collateral and make it available to Lender at a place to be designated by Lender, in its sole discretion; (d) The right to (i) demand payment of the Accounts; (ii) enforce payment of the Accounts, by legal proceedings or otherwise; (iii) exercise all the Borrower's and its Affiliates' rights and remedies with respect to the collection of the Accounts; (iv) settle, adjust, compromise, extend or renew the Accounts; (v) settle, adjust or compromise any legal proceedings brought to collect the Accounts; (vi) if permitted by applicable law, sell or assign the Accounts; (vii) discharge and release the Accounts; (viii) take control, in any manner, of any item of payment or proceeds referred to in Section 3.2; (ix) prepare, file and sign Borrower's name and any of its Affiliates' name on any proof of claim in bankruptcy or similar document against any Account Debtor; (x) prepare, file and sign Borrower's name and any of its Affiliates' name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Accounts; (xi) do all acts and things necessary, in Lender's sole discretion, to fulfill Borrower's obligations under this Agreement; (xii) endorse the name of Borrower or any of its Affiliates upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to the Accounts and inventory; (xiii) use Borrower's and any of its Affiliates' stationery and sign the name of Borrower or any of its Affiliates to verifications of the Accounts and notices thereof to Account Debtors; and (xiv) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Accounts and inventory to which Borrower has access; (e) The right to (i) sell or to otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by law, in lots or in bulk, for cash or on credit, all as Lender, in its sole discretion, may deem advisable; (ii) adjourn such sales from time to time, with or without notice; (iii) conduct such sales on Borrower's or any of its Affiliates' premises or elsewhere and use Borrower's or any of its Affiliates' premises without charge for such sales for such time or times as Lender may see fit; and (vii) the right to postpone or adjourn any sale of the Collateral from time to time by an announcement at the time and place of sale or by announcement at the time and place of such postponed or adjourned sale, without being required to give a new notice of sale.   .

Lender is hereby granted a license or other right to use, without charge, Borrower's and any of its Affiliates' labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral and Borrower's or any of its Affiliates' rights under all licenses and all franchise agreements shall inure to Lender's benefit. Lender shall have the right to sell, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit or any combination thereof, and Lender may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual

ACCOUNTS RECEIVABLE FINANCE AGREEMENT - Page No. 18      Rev. 0315                                       Initials [signature]

payment of such purchase price, may set off the amount of such price against the Liabilities. The proceeds realized from the sale of any Collateral shall be applied first to the reasonable costs, expenses and attorneys' fees and expenses incurred by Lender for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; second to interest due upon the revolving loan ; and third to the principal of the revolving loan. If any deficiency shall arise, Borrower shall remain liable to Lender therefor.

9.5    No Preservation or Marshaling. Borrower agrees that Lender has no obligation to preserve rights to the Collateral against prior parties or to marshal any Collateral for the benefit of any Person.

9.6    Notice of Collateral Disposition. Any notice required to be given by Lender of a sale, lease, other disposition of the Collateral or any other intended action by Lender, deposited in the United States Mail, certified mail, return receipt requested, postage prepaid and duly addressed to Borrower, at the address set forth in this Agreement, ten (10) days prior to such proposed action, shall constitute commercially reasonable and fair notice thereof to Borrower.

9.7    Appointment of Lender as Borrower's Lawful Attorney. In order to carry out this Agreement, Borrower irrevocably designates, makes, constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) and Lender, or Lender's agent, may, without notice to Borrower, and at such time or times thereafter as Lender or said agent, in its sole discretion, may determine, in Borrower's or Lender's name: (i) demand payment of the accounts; (ii) enforce payment of the Accounts, by legal proceedings or otherwise; (iii) exercise all of Borrower's rights and remedies with respect to the collection of the Accounts; (iv) settle, adjust, compromise, extend or renew the Accounts; (v) settle, adjust or compromise any legal proceedings brought to collect the Accounts; (vi) if permitted by applicable law, sell or assign the Accounts upon such terms, for such amounts and at such time or times as Lender deems advisable, after notice if required by applicable law; (vii) discharge and release the Accounts; (viii) take control, in any manner, of any item of payment or proceeds referred to herein; (ix) prepare, file and sign Borrower's name on any Notice of Lien, Assignment or Satisfaction of Lien or similar document in connection with the Accounts; (xi) do all acts and things necessary, in Lender's sole discretion, to fulfill Borrower's obligations under this Agreement; (xii) endorse the name of Borrower upon any of the items of payment or proceeds and deposit the same to the account of Lender on account of the Liabilities; (xiii) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to the Accounts and inventory; (xiv) use Borrower's stationery and sign the name of Borrower to verifications of the Accounts and notices thereof to Account Debtors; and (xv) use the information recorded on or contained in any data processing Equipment and computer hardware and software relating to the Accounts and inventory to which Borrower has access.

10.    **MISCELLANEOUS.**

10.1    Modification of Agreement; Sale of Interest. This Agreement and the Other Agreements may not be modified, altered or amended, except by an agreement in writing signed by Borrower and Lender. Borrower may not sell, assign or transfer this Agreement, or the Other Agreements, or any portion thereof, including, without limitation, Borrower's rights, titles, interests, remedies, powers, and/or duties hereunder or thereunder. Borrower hereby consents to Lender's participation, sale, assignment, transfer or other disposition, at any time or times hereafter, of this Agreement, or the Other Agreements, or of any portion hereof or thereof, including, without limitation, Lender's rights, title, interests, remedies, powers, and/or duties hereunder or thereunder. This Agreement and Other Agreements shall be binding upon and inure to the benefit of the successors and assigns of Borrower, each Affiliate, and Lender.

10.2    Expenses and Attorney's Fees. (A) If, at any time or times, whether prior or subsequent to the date hereof and regardless of the existence of an Event of Default, Lender employs counsel for advice or other representation or incurs legal and/or other costs and expenses in connection with: (i) the

ACCOUNTS RECEIVABLE FINANCE AGREEMENT - Page No. 19     Rev. 0315                                    Initials

negotiation, preparation, execution or performance of this Agreement, all Other Agreements, any amendment of or modification of this Agreement or the Other Agreements or any sale or attempted sale of any interest herein to a Participant; (ii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person) in any way relating to the Collateral, this Agreement, the Other Agreements or Borrower's affairs; (iii) any attempt to enforce any rights of Lender or any Participant against Borrower or any other Person which may be obligated to Lender by virtue of this Agreement or the Other Agreements, including, without limitation, the Account Debtors; and (iv) any attempt to service, inspect, verify, protect, collect, sell, liquidate or otherwise dispose of the Collateral; then, in any such event, the attorneys' fees arising from such services and all expenses, costs, charges, paralegal fees, and other fees of counsel or of Lender in any way or respect arising in connection with or relating to any of the events or actions described in this Section shall be payable (whether the above are reasonable or not), on demand, by Borrower to Lender and shall be additional Liabilities hereunder secured by the Collateral and, to the extent set forth in the Other Agreements; (B) Borrower shall pay to Lender, on demand, any and all fees, costs or expenses which Lender pays to a bank, other similar institution, or internet service provider arising out of or in connection with (i) the forwarding to Borrower or any other Person on behalf of Borrower, by Lender of proceeds of loans made by Lender to Borrower pursuant to this Agreement, (ii) the depositing for collection, by Lender of any check or item of payment received and/or delivered to Lender on account of the Liabilities, and (iii) internet reporting; (C) Borrower shall pay to Lender, on demand, any and all fees, costs or expenses of all out-of-pocket travel expenses of auditors for each field examination performed, long distance telephone charges, legal fees incurred in collecting the Accounts, postage, credit reports, wire transfers, overnight mail delivery, UCC searches, tax lien searches, filing fees, ACH transfers, incoming wires, returned items, and bank charges.

10.3    Destruction of Borrower's Documents. All documents, schedules, invoices, agings, or other papers delivered to Lender may be computer imaged, destroyed, or otherwise disposed of by Lender at any time after delivery to or receipt by Lender.

10.4    No Waiver by Lender. Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of an Event of Default by Borrower under this Agreement or the Other Agreements shall not suspend, waive or affect any other Event of Default by Borrower under this Agreement or the Other Agreements, whether the same is prior or subsequent thereto and whether it is of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or the Other Agreements and no Event of Default by Borrower under this Agreement or the Other Agreements shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing signed by an officer of Lender and directed to Borrower specifying such suspension or waiver.

10.5    Waivers by Borrower. Except as otherwise provided for in this Agreement, Borrower waives (i) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (ii) all rights to notice of a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; and (iii) the benefit of all valuation, appraisement and exemption laws. Borrower acknowledges that it has been advised by counsel with respect to this Agreement and the transactions evidenced by this Agreement.

ACCOUNTS RECEIVABLE FINANCE AGREEMENT - Page No. 20     Rev. 0315

Initials

10.6 <u>Severability.</u> Wherever possible, each provision of this Agreement shall be interpreted *in such* manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.7 <u>Conflict of Terms and Incorporation.</u> The provisions of the Other Agreements and any Schedule are incorporated in this Agreement by this reference thereto, and this Agreement constitutes the entire agreement of the parties and may not be modified or supplemented by any prior or contemporaneous oral understanding. Except as otherwise provided in this Agreement and except as otherwise provided in the Other Agreements by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in the Other Agreements, the provision contained in this Agreement shall govern and control.

10.8 <u>Equitable Relief.</u> **Borrower recognizes that, in the event Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lender; therefore, Borrower agrees that Lender, if Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving inadequacy of Lender's remedies at law.**

10.9 <u>Advances without Documentation.</u> Each loan or advance made by Lender to Borrower pursuant to this Agreement may or may not (at Lender's sole and absolute sole discretion) be evidenced by notes or other instruments issued or made by Borrower to Lender. Where such loans or advances are not so evidenced, such loans and advances shall be evidenced solely by entries upon Lender's books and records.

10.10 <u>Governing Law; Jurisdiction; Venue; Waiver of Jury Trial and Service of Process.</u>

**(A) THIS AGREEMENT SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OKLAHOMA APPLICABLE TO AGREEMENTS EXECUTED, DELIVERED, FORMED, AND PERFORMED WITHIN THE STATE OF OKLAHOMA, AND THE PARTIES AGREE AND STIPULATE THAT THIS AGREEMENT HAS BEEN SO EXECUTED, DELIVERED, AND FORMED, AND WILL BE SO PERFORMED. THE PARTIES AGREE AND STIPULATE THAT THE EXCLUSIVE JURISDICTION FOR ANY LITIGATION TO BE BROUGHT BY OR ON BEHALF OF BORROWER ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER SOUNDING IN LAW, EQUITY, CONTRACT, TORT, OR ANY OTHER THEORY, SHALL BE IN THE STATE DISTRICT COURT OR FEDERAL DISTRICT COURT LOCATED WITHIN OKLAHOMA COUNTY, OKLAHOMA. THE PARTIES STIPULATE AND AGREE THAT ANY FORUM OTHER THAN SUCH COURTS LOCATED IN OKLAHOMA COUNTY, OKLAHOMA, SHALL IMPOSE AN UNDUE HARDSHIP AND BURDEN UPON LENDER AND SHALL CONSTITUTE AN INCONVENIENT FORUM JUSTIFYING TRANSFER, REMOVAL, OR DISMISSAL, ON REQUEST OF LENDER , OF ANY ACTION FILED OUTSIDE SUCH JURISDICTIONS. BORROWER CONSENTS TO THE JURISDICTION OF SUCH COURTS. BORROWER WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE BY CERTIFIED MAIL DIRECTED TO BORROWER AT ITS ADDRESS AS IT APPEARS IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE (5) BUSINESS DAYS AFTER THE SAME SHALL HAVE BEEN DEPOSITED IN THE U. S. MAILS,**

Initials

CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTAGE PREPAID. BORROWER WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. NOTHING IN THIS SECTION SHALL AFFECT LENDER'S RIGHT TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT LENDER'S RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENT AND CONSENT OF THE PARTIES HERETO TO THE MATTERS SET FORTH HEREIN.

(B) EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES TO THE FULLEST EXTENT ALLOWED BY LAW ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTIONS SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENT AND CONSENT OF THE PARTIES HERETO TO THE MATTERS SET FORTH HEREIN.

10.11  Notice.  Except as otherwise provided in this Agreement, any notices, requests, or other communications required or permitted to be given hereunder shall be writing and shall be either (a) sent by prepaid overnight delivery for next business day delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (b) sent by telephone facsimile or email with .pdf attachments, in which case notice shall be deemed delivered upon transmission of such notice and evidence of receipt of said transmission, or (c) sent by hand delivery, in which case notice shall be deemed delivered upon receipt. A Party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Rejection or other refusal to accept or inability to deliver because of a changed address of which no notice was given shall be deemed to be receipt of the notice, request, or other communication. As used in this Agreement, a "business day" is a day which is neither a Saturday, Sunday, nor legal holiday for national banks in Oklahoma City, Oklahoma. Notices received after 5:00 p.m. Central Time shall be deemed delivered on the next business day.

10.12  Counterpart Execution; Electronic Transmission.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the Parties may execute and exchange counterparts of the signature pages by telephone facsimile or by email with ".pdf" (or other imaging format) attachments. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic transmission also shall

deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year specified at the beginning hereof.

Borrower:

VERTICAL HOLDINGS UNLIMITED, LLC
d/b/a VHU EXPRESS
a Florida limited liability company

By:
Its:     Managing Member

Address: 7853 Gunn Highway
         Tampa, FL 33626

ACCEPTED IN EDMOND, OKLAHOMA
this 15 day of October, 2015.
Diversified Lenders LLC,
an Oklahoma limited liability company

By:
Its:     Vice President

Address: 111 North Broadway, Ste. B
         Edmond, Oklahoma 73034

Initial

## SCHEDULE "A"

11. <u>SPECIAL PROVISIONS</u>

     11.1   <u>Advance Rate.</u> The loans against Borrower's Eligible Accounts, at Lender's sole discretion, may be in amounts of up to Eighty-Five Percent (85%) of the net amount of Borrower's Eligible Accounts.

     11.2   <u>Fees.</u> Borrower and Lender agree that the following fees constitute commercially reasonable compensation to Lender for agreeing to make funds available to Borrower under the terms provided in this Agreement and Borrower shall pay to Lender:

     A.   <u>Monthly Minimum Balance Fee.</u> In the event the average loan balance for any month (the "<u>Average Monthly Balance</u>") is less than $100,000.00 (the "<u>Minimum Average Monthly Balance</u>") the Borrower shall pay a fee (the "<u>Minimum Balance Fee</u>") calculated as follows: Minimum Average Monthly Balance <u>minus</u> the actual Average Monthly Balance <u>multiplied by</u> the Contract Rate <u>divided by</u> 360 days <u>multiplied by</u> the actual number of days in such month. The Minimum Balance Fee as so calculated shall be added to the principal balance of the Revolving Credit Note beginning on the first day of the month following the Funding Date and on the same day of each month thereafter during the term hereof and at maturity.

     B.   <u>Monthly Collateral Management Fee.</u> On the first day of the month following the Funding Date and on the same day of each month thereafter during the term of this Agreement a collateral management fee equal to the greater of One and Eight Tenths of One Percent (1.80%) of the Average Monthly Balance for the preceding month or $100,000.00 (the "<u>Collateral Management Fee</u>").

Initials 

## SCHEDULE 'B'

## LOCATIONS

Primary Address:
7853 Gunn Highway
Tampa, FL 33626


Additional Locations:

Initials

# Exhibit B

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Diversified Leaders, LLC
203 E. Main
Edmond, OK 73034

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any   ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any   ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME   Diversified Leaders, LLC | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |
| 3c. MAILING ADDRESS   203 E. Main | CITY   Edmond | STATE   OK | POSTAL CODE   73034 | COUNTRY |

4. This FINANCING STATEMENT covers the following collateral:

See Exhibit A attachment to this UCC Financing Statement for the Collateral Description

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)    International Association of Commercial Administrators (IACA)

EXHIBIT A, PAGE  41 OF 48

**Exhibit A**

All assets including but not limited to, all Debtor's present and future accounts, instruments, documents, chattel paper, general intangibles, deposit accounts, investment property, commercial tort claims, letter of credit rights, letters of credit, equipment and inventory, as more fully described as: (a) all Debtor's accounts, whether now existing or hereafter arising ('Accounts"); all chattel papers, documents and instruments, whether now existing or hereafter arising relating to Accounts; all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to Accounts or such chattel papers, documents and instruments; (b) all Debtor's general intangibles of any kind, whether now existing or hereafter arising ("General Intangibles"); all chattel papers, documents and instruments whether now existing or hereafter arising relating to General Intangibles; all rights now or hereafter existing in and to all security agreements, leases, and contracts securing or otherwise relating to General Intangibles or such chattel papers, documents and instruments; (c) all Debtor's inventory in all of its forms, whether now owned or hereafter acquired, wherever located, all accessions or additions thereto, products thereof, whether now owned or hereafter acquired ("Inventory"); (d) the proceeds, products, additions to, substitutions for and accessions of any property described in subparagraphs (a), (b), and (c) above; and (e) all Debtor's books, records, reports, memoranda, and/or data compilations, in any form (including, without limitation, corporate and other business records, customer lists, credit files, computer programs, print outs, and any other computer materials and record(s), of Debtor pertaining to any of the property described in subparagraphs (a), (b), (c), and (d) above.

NOTICE:

PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN.

## REVOLVING CREDIT NOTE

September 30, 2015

FOR VALUE RECEIVED the undersigned VERTICAL HOLDINGS UNLIMITED, LLC d/b/a VHU EXPRESS, a Florida limited liability company (the "Borrower") promises to pay to the order of DIVERSIFIED LENDERS, LLC, an Oklahoma limited liability company ("Lender", which term shall include its successors and assigns), or its assigns, at its offices at 111 North Broadway, Ste. B, Edmond, Oklahoma 73034 in lawful money of the United States of America, the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) or so much thereof as may from time to time be advanced by Lender to Borrower pursuant to the terms of the Accounts Receivable Finance Agreement (the "Agreement"; terms capitalized and not otherwise defined herein shall have the meanings given them in the Agreement) together with interest on the daily unpaid principal balance thereof from the date hereof until maturity at the Contract Rate.

It is contemplated that by reason of payments hereon there may be times when no indebtedness is owing hereunder; but notwithstanding such occurrences, this Note shall remain valid and shall be in full force and effect as to loans or advances made pursuant to and under the terms of the Agreement subsequent to each such occurrence. All loans or advances and all payments made hereunder or under the Agreement may be evidenced by Lender's records maintained in accordance with its usual practice. In the event of any legal action or proceeding in respect of this Note, the Lender's records shall be conclusive evidence of the existence and amounts of the Liabilities of Borrower.

Borrower and each other Person now or hereafter liable for payment of this Note or any of the other Liabilities are and shall be directly, primarily, jointly, and severally, liable for the payment of all such Liabilities, and Borrower and each other such Person hereby expressly waive bringing of suit and diligence in taking any action to collect any sums owing hereon and in the handling of any security, and Borrower and each other such Person hereby consent to and agree to remain liable regardless of any renewals, extensions, rearrangements, partial prepayments, or any release or substitution of security for this Note or any of the other Liabilities, in whole or in part, with or without notice, from time to time, before or after maturity thereof.

As is more fully set forth in the Agreement, it is the intention of Borrower and Lender to conform strictly to applicable usury laws and in no event to require payment of, or to pay, interest in excess of the Maximum Legal Rate

This Note is the Revolving Credit Note referred to in the Agreement.

THIS NOTE SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OKLAHOMA APPLICABLE TO AGREEMENTS EXECUTED, DELIVERED, FORMED, AND PERFORMED WITHIN THE STATE OF OKLAHOMA, AND THE PARTIES AGREE AND STIPULATE THAT THIS AGREEMENT HAS BEEN SO

REVOLVING CREDIT NOTE - Page 1      Rev. 0315                                    Initials

EXECUTED, DELIVERED, AND FORMED, AND WILL BE SO PERFORMED. THE PARTIES AGREE AND STIPULATE THAT THE EXCLUSIVE JURISDICTION FOR ANY LITIGATION TO BE BROUGHT BY OR ON BEHALF OF BORROWER ARISING OUT OF OR RELATED TO THIS NOTE, WHETHER SOUNDING IN LAW, EQUITY, CONTRACT, TORT, OR ANY OTHER THEORY, SHALL BE IN THE STATE DISTRICT COURT OR FEDERAL DISTRICT COURT LOCATED WITHIN OKLAHOMA COUNTY, OKLAHOMA. THE PARTIES STIPULATE AND AGREE THAT ANY FORUM OTHER THAN SUCH COURTS LOCATED IN OKLAHOMA COUNTY, OKLAHOMA, SHALL IMPOSE AN UNDUE HARDSHIP AND BURDEN UPON LENDER AND SHALL CONSTITUTE AN INCONVENIENT FORUM JUSTIFYING TRANSFER, REMOVAL, OR DISMISSAL, ON REQUEST OF LENDER , OF ANY ACTION FILED OUTSIDE SUCH JURISDICTIONS. BORROWER CONSENTS TO THE JURISDICTION OF SUCH COURTS. BORROWER WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE BY CERTIFIED MAIL DIRECTED TO BORROWER AT ITS ADDRESS AS IT APPEARS IN THE AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE (5) BUSINESS DAYS AFTER THE SAME SHALL HAVE BEEN DEPOSITED IN THE U. S. MAILS, CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTAGE PREPAID. BORROWER WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. NOTHING IN THIS SECTION SHALL AFFECT LENDER'S RIGHT TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT LENDER'S RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION. EITHER LENDER OR BORROWER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENT AND CONSENT OF THE BORROWER AND LENDER HERETO TO THE MATTERS SET FORTH HEREIN.

EACH OF BORROWER AND LENDER HEREBY EXPRESSLY WAIVES TO THE FULLEST EXTENT ALLOWED BY LAW ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE BORROWER OR THE LENDER OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH OF BORROWER AND LENDER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTIONS SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT EITHER OF BORROWER OR LENDER MAY

REVOLVING CREDIT NOTE - Page 2      Rev. 0315                              Initials

FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENT AND CONSENT OF BORROWER AND LENDER TO THE MATTERS SET FORTH HEREIN.

Borrower:

VERTICAL HOLDINGS UNLIMITED, LLC
d/b/a VHU EXPRESS
a Florida limited liability company

By: _____
Its: Managing Member

Address: 7853 Gunn Highway
        Tampa, FL 33626

Initials



600 University Street, Suite 3600
Seattle, Washington 98101
T. 206.624.0900
F. 206.386.7500
www.stoel.com

VANESSA SORIANO POWER
*Direct (206) 386-7553*
vanessa.power@stoel.com

June 6, 2016

**VIA EMAIL: LBYTHEWOOD@GMAIL.COM**

| | |
|---|---|
| Lisa Bythewood | Lisa Bythewood |
| CEO/President | Registered Agent |
| Vertical Holdings Unlimited, LLC | Vertical Holdings Unlimited, LLC |
| 11205 Sunny Delight Court | 1208 Facet View Way |
| Odessa, FL 33556 | Valrico, FL 33594 |

**Re:** *Diversified Lenders, LLC v. Amazon Logistics, Inc. and Vertical Holdings Unlimited, LLC*, **M.D. Fla Case No. 16-cv-1058-VMC-MAP**
**DEMAND FOR DEFENSE AND INDEMNIFICATION**

Dear Ms. Bythewood:

I am counsel for Amazon Logistics, Inc. ("Amazon"). As you know, Amazon was named as a defendant in the above-listed lawsuit, in which Vertical Holdings Unlimited, LLC ("VHU") was also named a defendant. A copy of the Complaint is attached for your reference.

As Amazon was sued as a result of VHU's failure to pay Plaintiff Diversified Lenders, LLC ("Diversified"), Amazon expects that VHU will defend and indemnify Amazon in this action. Pursuant to Paragraph 9 of the Delivery Provider Terms of Service, this letter serves as notice of Amazon's formal demand that VHU immediately undertake full defense and indemnification of Amazon. Under Paragraph 12(f)), VHU's obligation to defend and indemnify Amazon survive termination of VHU's contract with Amazon.

Please confirm receipt of this notice and VHU's agreement to defend and indemnify Amazon in this action. You may contact me if you have any questions.

Very truly yours,

Vanessa Soriano Power

cc: Amazon Logistics, Inc.

| | |
|---|---|
| **From:** | Power, Vanessa Soriano |
| **Sent:** | Monday, June 06, 2016 2:16 PM |
| **To:** | Lisa Bythewood |
| **Subject:** | RE: Diversified v. Amazon - Amazon Demand for Defense and Indemnification |

Ms. Bythewood,

Thank you for your email. Please be advised that VHU's refusal to indemnify Amazon constitutes breach of contract. Amazon will proceed accordingly to enforce its rights.

Please contact me if you have any questions.

Best regards,
Vanessa

**Vanessa Soriano Power** | Partner
**STOEL RIVES LLP** | 600 University Street, Suite 3600 | Seattle, WA 98101-4109
Direct: (206) 386-7553 | Mobile: (206) 696-1324 | Fax: (206) 386-7500
vanessa.power@stoel.com | Bio | vCard | www.stoel.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any unauthorized review, use, or distribution is prohibited and may be unlawful.

---

**From:** Lisa Bythewood [mailto:lbythewood@gmail.com]
**Sent:** Monday, June 06, 2016 1:58 PM
**To:** Power, Vanessa Soriano
**Subject:** Re: Diversified v. Amazon - Amazon Demand for Defense and Indemnification

Dear Ms. Powers,

 I will not indemnify Amazon as Amazon's failure to pay said invoices and the late payment of invoices is what has created the suit in the first place.

Once Amazon pays all outstanding invoices, late fees and damages we can move forward.

Thank you,

Lisa Bythewood

Sent from my iPhone

On Jun 6, 2016, at 4:29 PM, Power, Vanessa Soriano <vanessa.power@stoel.com> wrote:

> **Re:** *Diversified Lenders, LLC v. Amazon Logistics, Inc. and Vertical Holdings Unlimited, LLC*
> **M.D. Fla Case No. 16-cv-1058-VMC-MAP**
> **DEMAND FOR DEFENSE AND INDEMNIFICATION**
>
> Dear Ms. Bythewood,

Please see the attached letter on behalf of Amazon Logistics, Inc. This was sent by mail to the noted addresses last week. I'm now directing the same to you by email.

I look forward to hearing from you. If VHU is represented by counsel, please let me know their contact information and I will follow up with your counsel directly.

Best regards,
Vanessa

**Vanessa Soriano Power** | Partner
**STOEL RIVES LLP** | 600 University Street, Suite 3600 | Seattle, WA 98101-4109
Direct: (206) 386-7553 | Mobile:  (206) 696-1324 | Fax: (206) 386-7500
vanessa.power@stoel.com | Bio | vCard | www.stoel.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any unauthorized review, use, or distribution is prohibited and may be unlawful.

<06-06-2016 VHU Indemnification Demand - Email.PDF>

<Complaint.pdf>